J. P. Stadtmueller, U.S. District Judge
This is a trademark and copyright infringement case brought by Plaintiffs, collectively referred to as "Harley-Davidson," against Defendants, collectively referred to as "SunFrog." SunFrog runs a website where third parties can upload designs and logos, place them onto clothing, hats, mugs, or other items, and sell them. SunFrog handles printing the goods and shipping them, and it takes the majority of the profits from the sales. Harley-Davidson noticed that SunFrog advertised and sold many items bearing its trademarks, including both word-marks and logos, and it filed this lawsuit as a result. Before the Court is Harley-Davidson's motion for partial summary judgment. For the reasons stated below, it will largely be granted.
1. LEGAL STANDARD
Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any *1010 material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; Boss v. Castro , 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
The court construes all facts and reasonable inferences in the light most favorable to the non-movant. Bridge v. New Holland Logansport, Inc. , 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." Berry v. Chicago Transit Auth. , 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [its] case is convincing, [it] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." Waldridge v. Am. Hoechst Corp. , 24 F.3d 918, 921 (7th Cir. 1994).
To meet its burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "It is well-settled that speculation may not be used to manufacture a genuine issue of fact." Amadio v. Ford Motor Co. , 238 F.3d 919, 927 (7th Cir. 2001) ; McDonald v. Vill. of Winnetka , 371 F.3d 992, 1001 (7th Cir. 2004) ; Palucki v. Sears, Roebuck & Co. , 879 F.2d 1568, 1572 (7th Cir. 1989) ("A party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture" but must instead rest on the witness' personal knowledge). The Seventh Circuit has repeatedly emphasized that summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Hammel v. Eau Galle Cheese Factory , 407 F.3d 852, 859 (7th Cir. 2005).
2. RELEVANT FACTS
2.1 Harley-Davidson and Its Marks
Harley-Davidson is the largest manufacturer of motorcycles in the United States and has long been one of the world's most recognized motorcycle companies. For more than 110 years, it has continuously manufactured, promoted, and sold motorcycles and related products.[1]
*1011 Harley-Davidson owns several marks relevant to this litigation. They include the word marks HARLEY-DAVIDSON, HARLEY, H-D, HD, FAT BOY, and SPORTSTER, as well as Harley-Davidson's Bar & Shield logo, Willie G. Skull logo, and Number 1 logo trademarks shown below.
Harley-Davidson has used each of these marks, which will be referred to collectively as the "H-D Marks," for many years in connection with motorcycles, motorcycle parts and accessories, and various other products and services, including apparel, mugs, and posters. The H-D Marks are part of premium brands and Harley-Davidson has a reputation for providing a wide variety of high-quality merchandise under those brands itself and through its dealers and licensees.[2]
Given the incredible commercial success of Harley-Davidson's motorcycle business over the years and its status as an iconic brand, there has long been a strong demand from motorcycle enthusiasts as well as the general public for other products bearing the H-D Marks, so they can show their affinity for Harley-Davidson. To satisfy this demand and to further build awareness of the H-D Marks, Harley-Davidson has for decades engaged in an extensive program of licensing the H-D Marks for use on a wide range of products, including apparel, mugs, and posters, among others.
Consistent with its image as a premium brand, Harley-Davidson positions its licensed merchandise as high-quality, sold at a premium price point sold through select channels of trade. The retail prices of Harley-Davidson's licensed products typically range between $25 and $80 for apparel, between $20 and $45 for hats, and between $9 and $23 for mugs.
To ensure and maintain the high-quality reputation of licensed merchandise sold under the H-D Marks, Harley-Davidson requires its licensees to comply with stringent quality standards, including that: (1) licensees must first submit product concepts and artwork for Harley-Davidson's prior written approval; (2) once the concept *1012 and artwork is approved, licensees must submit a pre-production product sample for Harley-Davidson's prior written approval; and (3) once the pre-production product sample is approved, licensees must submit for Harley-Davidson's prior written approval a production sample of the actual product that will be sold to the public. Licensees cannot promote or advertise any licensed products without completing all of these steps. As part of this quality-control review process, Harley-Davidson carefully reviews the licensed products in numerous respects, including the materials used, the quality of the craftsmanship and construction, the design, style, and appearance of the products, and their overall quality.[3]
According to its trademark counsel, Harley-Davidson's trademark license agreements typically contain a provision that the licensee may not use the marks "in any manner that would disparage, tarnish, or dilute the distinctive quality of the Licensed Marks or the reputation and goodwill represented by the Licensed Marks or which would reflect adversely on the Licensed Marks, [Harley-Davidson], or any of [its] products or services," to be determined in Harley-Davidson's sole discretion. (Docket # 47 ¶ 3). In addition, Harley-Davidson has various guidelines in place for reviewing the artwork and other content on licensed products, including prohibitions against:
• depictions of religious symbols or language from any religion;
• vulgar, crude, or offensive content;
• satanic or excessively violent depictions of skulls;
• display of guns or the word "gun," except in rare instances (e.g. , military motorcycles);
• displaying certain of Harley-Davidson's trademarks on licensed products, including the "corporate" Bar & Shield Logo with the text "HARLEY-DAVIDSON MOTOR COMPANY" that is reserved for corporate use; and
• any modified or mutilated versions of any of the H-D Marks.
Id. ¶ 4.
Harley-Davidson has achieved significant commercial success in the motorcycle business, which includes the sales and servicing of motorcycles and the sales of motorcycle parts, accessories, and riding gear. Harley-Davidson and its authorized dealers have sold many billions of dollars of such products and services over the years. Harley-Davidson's licensed products business has also been wildly successful, with Harley-Davidson's royalty revenues from licensing exceeding $400 million during 2005-2016 alone, which translates into billions of dollars of sales of licensed products at retail.
Apparel is a significant part of Harley-Davidson's business and has been for many years. The majority of Harley-Davidson's licensing royalty revenues are from its apparel licensees. Harley-Davidson currently has approximately ten apparel licensees and has had a similar number of apparel licensees or more for many *1013 years. For decades, Harley-Davidson has offered and sold, itself and through its dealers and licensees, riding gear and apparel bearing the H-D Marks, including t-shirts, shirts, sweatshirts, sweaters, pants, vests, jackets, and hats. During this same time, Harley-Davidson has offered and sold through its licensees a wide range of merchandise bearing the H-D Marks, including licensees for mugs and posters.
The H-D Marks have been extensively promoted nationwide across Harley-Davidson's many product lines. Harley-Davidson markets and sells motorcycles, motorcycle parts and accessories, and riding gear, including apparel, under the H-D Marks through a network of more than 690 authorized dealers located throughout the country, and through numerous other authorized Harley-Davidson retail outlets, including high-profile and high-traffic outlets (e.g. , stores located at popular airports). Harley-Davidson's apparel products are also sold online through harley-davidson.com and the websites of Harley-Davidson's authorized dealers and licensees.
Harley-Davidson and its authorized dealers and licensees have spent many millions of dollars promoting the H-D Marks through virtually every medium. For example, Harley-Davidson has promoted its products and marks through dealer promotions, customer events, catalogs, direct mailings, national television, print, and radio advertisements, and the internet. For many years, Harley-Davidson and its dealers have sponsored sports teams and major sporting events, including prominent use of the H-D Marks on advertisements or promotions at such events. Harley-Davidson and the H-D Marks have also received intense unsolicited media attention for decades. Harley-Davidson's products and services have been featured and identified under the H-D Marks in numerous national television programs, books, national newspapers and magazines, and popular online publications and websites.
The Harley-Davidson brand has been ranked annually for the past decade among the top 100 most valuable brands in the world by Interbrand, a leading independent branding firm. In 2015, Interbrand estimated the value of the Harley-Davidson brand at $5.46 billion. In 2016, Tenet Partners ranked the Harley-Davidson brand as the 11th Most Powerful Brand in its Top 100 Most Powerful Brands report of 2016.
2.2 SunFrog and Its Business
SunFrog is in the business of marketing, printing, and selling apparel, including t-shirts, sweatshirts, hoodies, leggings, and other products such as mugs, on its website. The website includes an online retail marketplace where consumers can purchase the products advertised thereon. But the key feature of the site, and the source of much of SunFrog's success, is that it also provides a "user-friendly," "simple" online platform where: (a) "artists" can upload designs or artwork to SunFrog's "All SunFrog Art Online Database" ("All Art database") for application to products by the artists and by others; and (b) individuals or businesses can open accounts as "sellers" and create new products bearing their own designs they upload to advertise and sell on SunFrog's website, and where they can advertise and sell products using designs created by others. See (Docket # 57 ¶ 6). SunFrog itself creates no designs, graphics, or images for use on products, though when one user wishes to share his design with others, SunFrog is the intermediary and makes that design available through its website.
SunFrog's users can create online profiles and choose their own usernames. The sellers can, if they wish, be effectively anonymous to the public because they are *1014 identified on SunFrog's website only by account names or numerical codes that may not reveal their real names or contact information. For example, SunFrog's sellers include "harley davidson" and "HD," neither of which are Harley-Davidson itself, as well as "LOKI," "POKA," "81088," and "75237," among many others. Nevertheless, any user must submit and verify an email address before opening an account. Further, to receive any payments from SunFrog, a user must have a valid email address tied to a financial service provider like PayPal or provide routing and account numbers for a bank account. Thus, SunFrog can to some extent identify individual users.
SunFrog's sellers create new products by selecting "blank" products (e.g. , a t-shirt bearing no images, designs, or text) made available by SunFrog and then adding logos, images, or text to be printed on the products. Using SunFrog's online software, artists generate mockups of the finished product bearing their images or designs. As noted above, artists can share their mockups with other SunFrog users. If an artist shares his mockup and another user sees it and likes it, she may purchase from SunFrog a product bearing the desired design. In addition to printing the products as designed, SunFrog affixes its own trademarks and logos onto the products themselves, the products' tags, or both.[4]
SunFrog then advertises and offers these finished products on its website. For example, sellers have opened accounts, selected a blank t-shirt, and added designs displaying one or more of the H-D Marks in just a few minutes.[5]
When consumers purchase products on SunFrog's website, SunFrog handles the payment transaction and then prints and ships the products to the consumers. SunFrog's printers are "highly automated" and print on-demand when a user submits a design for printing. (Docket # 57 ¶ 4). However, live employees do all the other work of the business, including servicing and running the printers, feeding the *1015 printers with raw materials sourced by SunFrog, handling and shipping finished products, and processing payments. Id. ¶ 10. Because all products are produced on-demand, SunFrog does not keep any inventory of finished products.[6]
In addition to creating and uploading new designs, sellers can also sell existing designs created by others that SunFrog makes available to all sellers in its All Art database. Pursuant to SunFrog's terms of service, SunFrog automatically obtains a license from an artist that gives it the right to use and permit others to use the artist's design and to make those designs available to all sellers on its website. The All Art database is searchable by keyword and categories (e.g. , "Automotive"). Relevant here, the All Art database has made available to sellers numerous designs and artwork containing one or more of the H-D Marks that the sellers can immediately apply to numerous blank products of various styles, colors, and sizes, and offered for sale with just a few keystrokes. SunFrog's searchable database, moreover, made it easy for sellers to locate such designs, as they were instantly accessible by searching for the H-D Marks of interest.
According to SunFrog's published compensation schedule in effect when this lawsuit was filed and during the majority of this case, sellers receive 40% of the retail sales price for the products they sell, and an extra 5.5% if they also created and uploaded the design-i.e. , they were the "artist" for the design. SunFrog earns the majority, 54.5%, of the retail sales price of products sold on its website. SunFrog's products bearing H-D Marks typically sell for about $23-$37 for t-shirts, $43-$53 for hoodies, $18-$20 for hats, and $18-$24 for mugs.
SunFrog's user agreement in effect during the relevant period allows it to terminate the accounts of repeat infringers of another's intellectual property. However, the contract permits SunFrog to fulfill orders for infringing products even after a takedown notice is received. The contract also allows it to keep sellers' commissions for sales of products that were the subject of takedown notices. The agreement permits, but does not require, SunFrog to forward those commissions to a charity of its choosing. See (Docket # 11 ¶¶ 19-20).
SunFrog has long touted Facebook as a powerful marketing tool to advertise its products. SunFrog facilitates the advertisement of products on its website on social media sites, including Facebook, by providing its sellers with sales tracking tools and offering tutorials for social media marketing. For instance, SunFrog has offered Facebook marketing advice on a blog on its website since as early as 2015. It also has a dedicated Facebook page it created for its sellers. Further, SunFrog's "SunFrog Academy" has taught its sellers how to use Facebook for marketing since as early as January 2017.
Because of SunFrog's focus on Facebook as its primary means to promote and sell products on its website, Facebook advertising is the source of the vast majority of SunFrog's sales. For example, in a June 16, 2017 interview with Payoneer, SunFrog's Affiliate Support official Tyler Deerfield stated, "at least 75% of SunFrog sales come from Facebook ad referrals.
*1016 The Facebook ads platform pairs perfectly with SunFrog print technology." (Docket # 48 ¶ 11). The interview continues, "While artists and sellers can have some luck posting organically (without ads), it's unlikely to have a high degree of success without targeting."Id.
More recently, in an interview with Entrepreneur on August 2, 2017, SunFrog's founder and CEO Josh Kent ("Kent") stated, "Nothing touches Facebook ads.... I'm telling you right now, nothing compares to Facebook ads. Focus your energy in on that... [,] that's our secret sauce.... 95% of our sales, they're are coming through Facebook. Facebook is a force" and "[SunFrog] even [has] an academy...[where] we're going to show you how to set up [a] [Facebook] ad [and] target...." Id. ¶ 8.
Facebook ads that feature SunFrog products bearing H-D Marks attract wide exposure. For example, five separate Facebook ads for five different products bearing H-D Marks had a combined total of more than 116,000 reactions (e.g. , "likes"), more than 3,300 comments, and more than 31,000 shares. The ad for one such product had received 3,800 reactions, had been shared 634 times, and had 60 comments as of July 2, 2017, four days after it was posted on June 29. As of July 13, 2017, the total reactions or likes increased from 3,800 to 6,100, the number of times the link was shared increased from 634 to 1,079, and the number of comments increased from 60 to 118. The advertisement still had a direct link as of July 13, 2017 to the sales page for the product on SunFrog's website.
2.3 SunFrog's Commercial Success
SunFrog's business has been highly successful. Regarding revenues, in his interview with Entrepreneur on August 2, 2017, Kent stated that "[w]e launched this website and in our first year we did about a million dollars. In our second year, we did just shy of $100 million. We had some incredibly explosive growth." (Docket # 48 ¶ 8). Further, according to a July 9, 2017 Crain's Detroit Business article based on an interview with Kent, SunFrog's projected sales are "up to $150 million [in 2017]"; SunFrog's sales were "$100 million [in 2016]"; and "SunFrog is now the largest maker of printed t-shirts in the U.S." Id. ¶ 9. A June 30, 2017 Forbes article stated that "SunFrog is a three-year-old company with revenue of more than 100 million per year." Id. ¶ 10.[7]
Regarding unit sales, in a June 7, 2017 interview with Crain's, Kent stated, "Our initial goal was to sell 100 shirts a day, and if we could do that then we could be in a position to focus on it more. That 100 shirts a day quickly became 10,000 a day and kept going. It was bigger than I had planned or hoped for." Id. ¶ 12. In a July 11, 2016 interview with MyNorth, Kent said, "Our goal was to make 100 shirts a day. Now sometimes we're up to 20,000 shirts a day. We want SunFrog to be to t-shirts what Amazon was (originally) to books." Id. ¶ 13.
Regarding website traffic, SunFrog's website was popular and highly trafficked during the period relevant to this suit. In the interview with Entrepreneur on August 2, 2017, Kent reported that "within just a few short years we [have] become one of the world's highest trafficked sites. I think we hit about two something, 200 or *1017 300 on the Alexa ranking.... We passed Nike, Under Armor, Victoria's Secret, sky rocket up.... We live in a day and time where you can build a dream and you can compete head to head, like we do...with brick and mortar J.C. Penney's and these other companies and you can do it in almost no time at all and you can do it leveraging social media." Id. ¶ 8. Although its estimates vary, SunFrog often claims that its website is among the top 500 most popular websites in the United States and in the top 2,000 in the world.
2.4 The Infringing Products
Harley-Davidson has identified twelve different types of products sold by SunFrog that bear designs that infringe its trademarks, including ladies' t-shirts, men's' t-shirts, youth t-shirts, ladies' V-neck t-shirts, men's' V-neck t-shirts, long-sleeve shirts, tank tops, sweatshirts, hoodies, leggings, mugs, and hats. SunFrog lists each of these twelve types of goods separately on pages and drop-down menus in its website. Not every H-D Mark appeared on every type of good, although the majority did. See (Docket # 51 ¶ 55). Further, Harley-Davidson's infringement analysis, reflected in voluminous charts appended to its submissions, shows only one particular infringing design used on each of the twelve types of products. However, most of the product types have been offered with multiple, distinct infringing designs, many of which bear two or more H-D Marks.[8]
In March and April of 2017 alone, SunFrog's website featured more than 100 different infringing designs on thousands of products. That represents more than 1,325 different individual counterfeit products and more than 2,575 unauthorized uses of the H-D Marks. Of course, as SunFrog's corporate counsel notes, the designs appearing on the website do not translate into products unless someone actually orders a product. According to counsel, the vast majority of mockups never result in a single sale.[9]
None of these products were subject to Harley-Davidson's quality control standards and procedures. In addition, a number of them would not have been approved as licensed products because they violate Harley-Davidson's guidelines for objectionable content, including the inclusion of religious symbols, vulgar, crude, or offensive language, satanic or excessively violent depictions of skulls, and the word "gun." Other products display the text "Harley-Davidson Motor Company," which
Harley-Davidson only uses for corporate purposes and would not approve for *1018 use on licensed products. Still others display H-D Marks in modified or mutilated form, as would not be permitted in licensed products. Harley-Davidson obtained several infringing products through test purchases or as a result of seizures by government officials. In each case, products were shipped from SunFrog's factory in Gaylord, Michigan. Several of the products have a printed neck label or other label with the SunFrog trademark on it, which Harley-Davidson suggests shows a co-branding or licensing relationship between SunFrog and Harley-Davidson where none exists. SunFrog denies such a relationship exists, too, and that any such suggestion arises from the labels.
2.5 Harley-Davidson's Takedown Notices and SunFrog's Response
Since October 2016, SunFrog marketed, promoted, advertised, and sold products bearing H-D Marks-primarily apparel-on its website. Harley-Davidson placed SunFrog on notice of its trademark rights by submitting at least seventy objections, starting in October 2016 and continuing to May 2017, encompassing well over 800 items. SunFrog responded by removing the challenged designs.[10] Yet infringement continued, as new infringing designs would rapidly replace those that had been removed, and all the while SunFrog continued to market, promote, advertise, and sell such products on its website. For a significant period of time, SunFrog's conduct showed that it expected it would have to do no more than respond to takedown notices in order to adequately address the intellectual property rights of third parties.
Despite Harley-Davidson providing SunFrog with a link to each accused product on the website, SunFrog typically took at least two days and as long as seven days to deactivate the product listing. For example, of the 548 products for which Harley-Davidson submitted takedown complaints that were the subject of the declaration of Abel Low, a Harley-Davidson Brand Protection Manager, (Docket # 10), SunFrog took three or more days to remove 78% of those products and 4-7 days for 35% of them.
In addition to the time it took SunFrog to remove products identified by Harley-Davidson in its takedown notices, SunFrog continued to display many of the products even after they were "removed." SunFrog continued to display such products in search results on its website. Further, it continued to use image URLs, product URLs, and sales-tracking URLs for "removed" products to drive traffic to its website. SunFrog's URLs are widely distributed on social media and other websites, and persons clicking on those URLs for a "removed" product would be linked to SunFrog's website and receive either a page advertising other SunFrog products or a message inviting the consumer to "start over" and conduct a search for products. In some cases, when a user would encounter an infringing product in a search result page and click on it, he would be redirected to a page selling a non-infringing product. SunFrog's removal of the sales pages of some infringing products during March and April 2017 did not stop SunFrog or its sellers from advertising and offering new infringing products bearing identical H-D Marks or even identical infringing designs that SunFrog earlier acknowledged and "removed" in its responses to H-D's prior complaints.
Despite Harley-Davidson's numerous and repeated complaints, SunFrog continued *1019 up to the filing of this lawsuit on May 19, 2017 (and beyond) to advertise, offer for sale, and sell numerous infringing products. First, SunFrog continued to advertise and sell numerous infringing products in April and May 2017 bearing the identical H-D Marks cited in Harley-Davidson's prior takedown complaints in March and April of that year. Second, SunFrog continued to allow the same anonymous sellers that were repeat infringers of the H-D Marks and identified in Harley-Davidson's prior takedown complaints-such as "BW999" and "Bomman"-to offer and sell hundreds of infringing products.
Third, SunFrog continued to advertise and sell infringing products bearing designs identical to those identified in Harley-Davidson's prior takedown complaints. On March 31, 2017, Harley-Davidson objected to many such products, including three that SunFrog stated it had "removed" in response to the takedown complaints. Shortly after these "removals," dozens of new infringing products bearing these same three designs were posted on the website and were still available for purchase as of May 15, 2017.
Finally, when Harley-Davidson first submitted takedown complaints to SunFrog in October 2016, SunFrog's products consisted of apparel for adults. SunFrog later expanded its offerings to include leggings (November 2016), youth t-shirts (January 2017), and mugs (February 2017). Despite Harley-Davidson's objections to hundreds of other infringing products, many designs within these new types of products soon bore H-D Marks that were the subject of the earlier takedown complaints.
SunFrog counters by noting the volume of user-generated designs and takedown notices. At its peak, SunFrog had roughly 150,000 user-generated designs uploaded to its website every day. Further, "during a relatively brief period, Plaintiffs' [sic] submitted at least [810] takedown requests that SunFrog responded to by removing the allegedly infringing designs." (Docket # 51 ¶¶ 77-81). SunFrog believes its practices with respect to its notice and takedown tool are in accord with industry norms, and as will be detailed below, it has continued to develop new anti-piracy tools. See infra Part 2.7.
2.6 The Infringement Continues
Harley-Davidson filed this action on May 19, 2017. (Docket # 1). The complaint recites claims for: (1) trademark counterfeiting under 15 U.S.C. § 1114(1) ; (2) trademark infringement under 15 U.S.C. § 1114(1) ; (3) trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a)(1)(A) ; (4) trademark dilution under 15 U.S.C. § 1125(c) ; (5) copyright infringement under 17 U.S.C. § 101 et seq. ; (6) trademark infringement under Wis. Stat. § 132 et seq. ; and (7) common law trademark infringement, unfair competition, and misappropriation. Id. at 38-45.
Shortly after it filed the complaint, on May 30, 2017, Harley-Davidson moved for a preliminary injunction. (Docket # 5). On June 21, 2017, SunFrog filed a brief in opposition, claiming it had implemented "non-monetary relief" that "fully resolve[d]" Harley-Davidson's concerns and that the motion was moot because SunFrog was: (1) no longer using or displaying any of the H-D Marks on its website; (2) no longer using or displaying any images with the H-D Marks on its website (i.e. , no infringing designs or products); (3) no longer selling infringing products after removal; and (4) no longer allowing repeat infringers to sell any infringing products. See (Docket # 16).
Despite these representations, infringement continued. First, SunFrog continued *1020 to advertise and offer to sell numerous infringing products bearing the same H-D Marks cited in Harley-Davidson's prior takedown notices, and SunFrog continued to display numerous infringing designs on its website which Harley-Davidson had identified in its motion. The motion identified 115 different infringing designs available during May 2017, and 93 of those were still available on June 22, 2017. More than 40 of these 93 designs displayed one of the H-D Marks in the product title or description.
Second, SunFrog continued to allow some of the same prolific sellers to continue selling infringing products. Third, SunFrog advertised and offered for sale infringing products created before and after May 30, 2017. Fourth, SunFrog expanded the types of products it offered from shirts, leggings, and mugs bearing the H-D Marks to also include hats. Fifth, SunFrog continued to include infringing products in search results on its website. Searches on the site on July 3, 2017 for HARLEY-DAVIDSON, HD, H-D, and FATBOY continued to return results for infringing products bearing those marks. Sixth, SunFrog continued to allow infringing designs to be present in the All Art database. Seventh, SunFrog continued to allow sellers to create new infringing designs, apply them to blank products, and sell them.
Even after Harley-Davidson's July 5, 2017 reply brief reported these continuing violations, SunFrog persisted. At the scheduling conference on July 14, 2017, SunFrog again represented that the motion for preliminary injunction was moot because it had resolved all of Harley-Davidson's concerns. In response, Harley-Davidson provided evidence at that conference of SunFrog's continuing infringement up to the time of the conference. See (Docket # 24, # 25). As in prior submissions, Harley-Davidson proffered evidence that SunFrog continued to sell previously identified infringing products, allowed the creation of new products using previously identified infringing designs, and included infringing products in search results. Furthermore, SunFrog continued to use URLs for infringing products.
As the Court observed in its order granting the motion for preliminary injunction, "even after SunFrog filed its brief in opposition to the motion for preliminary injunction (and even as of the day of the Court's Rule 16 scheduling conference a month later), most of the infringing products Harley-Davidson identified initially were still advertised on SunFrog's website and available for sale." (Docket # 33 at 6).[11] Even after the Court issued that order on July 31, 2017-more than two months after this lawsuit was filed-SunFrog continued its infringement. It continued to offer and sell new infringing products, continued to allow repeat offenders to sell infringing products, including sellers identified in prior takedown complaints, continued to display images of infringing products on its website, continued to use URLs containing an H-D Mark, continued to offer infringing designs in the All Art database, and advertised and sold infringing products on Amazon. These constituted violations of the Court's order. Harley-Davidson's counsel sent SunFrog's counsel emails on August 7, 11, 15, and 18, October 25, and November 15, 2017 documenting in exacting detail SunFrog's violations of that order. It does not appear from the record that SunFrog has received any notices of continuing violations since November 2017. See (Docket # 50 at 13).
*1021 2.7 SunFrog's Anti-Infringement Efforts
SunFrog's in-house counsel, Christopher Carol ("Carol"), provided a lengthy affidavit describing the company's growing pains as they relate to anti-infringement efforts. As might be expected, Harley-Davidson quarrels with his merciful view of his company's struggle to cope with intellectual property infringement. Those disputes will be discussed further below. For present purposes, it will better serve the narrative to set forth his averments while largely ignoring Harley-Davidson's disagreements. That said, it is important to appreciate that Carol gives almost no dates for the developments he describes, and thus it is difficult to fit his claims within the timeline of this case.
Carol attests that because SunFrog grew rapidly as a company during the past three years, it faced "a number of challenges when scaling its services." (Docket # 57 ¶¶ 18-20).[12] One of SunFrog's most consistent problems involved "bad actors" uploading and selling designs that infringed upon the intellectual property rights of a third party. Id. Although SunFrog requires its users to affirmatively check a box that places SunFrog's intellectual property policy within a user's line of sight and requires him or her to agree never to use SunFrog's services to infringe on another party's intellectual property rights, SunFrog found itself struggling to stay ahead of a small minority of "sophisticated bad actors." Id.
Because it can be difficult to track users who deliberately obfuscate their identities online, SunFrog experimented when it decided to terminate a user's account because he or she had violated SunFrog's policies. Through long trial and error, SunFrog found that the most successful way to ban offenders after they were identified is to prohibit new accounts from using the same payment information associated with another account.
SunFrog says that its business model relies on a concept called "affiliate marketing," whereby a user markets designs to others and receives a commission for their efforts. Affiliate marketing requires a degree of knowledge and sophistication in users and SunFrog provides educational materials to its users in effort to improve their experience in utilizing this technique. According to SunFrog, "[t]hese are well known[,] authentic marketing techniques designed to draw in more users due to the customer service and quality of the platform." Id. ¶ 23.
As stated previously, at its peak, SunFrog's users uploaded more than 150,000 new designs every day. Given the constancy with which this volume of new designs poured onto the various pages on its website, SunFrog contends that "it became easy for a small number of bad actors to upload and sell mockups made with infringing designs." Id. ¶ 26. SunFrog has worked to develop tools that not only keep pace with the demand created by users wanting to design and share mockups, it *1022 has worked to develop tools to curb intellectual property infringement and give rights holders the ability to notify SunFrog of allegedly infringing mockups with ease, such as a streamlined notice and takedown procedure, which is an industry norm. SunFrog ensured that trained and dedicated employees evaluated notifications of allegedly infringing designs and, when appropriate, removed those designs as quickly as was practicable.
As SunFrog continued to grow, it became more difficult to prevent even a small number of users from creating constant infringement problems. To proactively make SunFrog less attractive for such conduct, SunFrog began to implement keyword blocking to prevent designs described with words that it had learned over time had a high probability of being associated with intellectual property infringement from going live on SunFrog's website in the first place. While keyword blocking was and remains a "hugely successful" tool in SunFrog's arsenal, some repeat offenders realized that they could get around the control by hiding keywords in the visual designs they uploaded. Id. ¶ 31.
SunFrog has worked with several rights holders to establish lists of keywords used to filter user-generated uploads in real time to prevent known infringing material from publishing on the website without blocking legitimate content. SunFrog has also provided certain rights holders with back-end access to its website to allow them to monitor its anti-infringement efforts and screen user uploads to flag infringing designs. Another tool developed by SunFrog to protect rights holders allows for the profits from allegedly infringing items to be diverted from the sellers' accounts into participating rights holders' accounts. Though often skeptical at first, Carol says that most rights holders with which SunFrog has dealt during the past year have been satisfied with the many steps SunFrog has taken to combat alleged intellectual property infringement.
In response to this development and to protect rights holders with visual instead of textual trademarks, SunFrog expended a considerable amount of time, energy, and money researching potential solutions before partnering with a leading provider of OCR technology, which SunFrog now uses to screen new designs as users submit them in an attempt to identify and prevent the sharing of infringing designs. In addition to automating the screening process, SunFrog has implemented training on intellectual property issues for a number of its employees in key areas of the business. SunFrog does not describe what this training involves in any way.
Many links to allegedly infringing designs are disabled within hours of being reported. SunFrog contends that it has never knowingly allowed an infringing design that has been reported to remain available. SunFrog also maintains that until a rights holder reports designs as infringing, it would have no way of knowing whether the user did or did not own rights in that design. As must be clear from the preceding narrative, Harley-Davidson disagrees, contending that SunFrog's slow response to takedown requests and its allowing repeat infringers to continue infringing demonstrate that it was a willing participant in-or at least willfully blind to-infringing designs available on its website.
Despite its investments, SunFrog realized that users who wanted to sell infringing products had also gotten more advanced. Frustrated by the sheer volume of troublesome submissions and seeking to find a way to proactively monitor them, SunFrog began investigating, in November 2017, a suspicion that a few parties had learned to use "bots" to automate the process of creating and uploading designs, often using existing designs as the building *1023 blocks. That same month, SunFrog took steps to prevent bots from uploading designs to its website, which reduced the daily number of user-generated designs uploaded to SunFrog's site to roughly 10,000 per day. While still daunting, this reduction in the volume of submissions not only improved the response time for takedown requests, it also allowed SunFrog to temporarily channel the many anti-piracy tools it has developed in one direction if SunFrog becomes aware of a more specialized content problem. Reducing the amount of submissions also allowed SunFrog to develop new tools to monitor uploads and to take action against infringing content.
Currently, SunFrog is focusing specific resources on preventing users from sharing designs that may infringe on Harley-Davidson's intellectual property. Two employees monitor keywords in a Harley-Davidson rights holder account and look for activity on social media platforms like Facebook on a daily basis. SunFrog's customer service employees have received training on how to monitor orders for infringing products, with instruction to cancel and refund orders containing Harley-Davidson's intellectual property and to notify the legal department upon finding an infringing design. SunFrog says that it continues to develop new anti-infringement tools, though it does not describe what those tools might be.
SunFrog reports that in the past four years, it has terminated 3,394 accounts. Further, "[s]ince tuning up its hard won anti-infringement apparatus and using it to [protect] [Harley-Davidson's] Intellectual Property from third parties who might attempt to upload infringing designs to SunFrog's website, SunFrog has identified a small number of accounts abusing [Harley-Davidson's] Intellectual Property and subsequently terminated 13 accounts." Id. ¶ 53. It does not report when this occurred, though ostensibly it was after the lawsuit was filed. SunFrog also has implemented a zero-tolerance policy for accounts attempting to infringe upon Harley-Davidson's rights.
Further, SunFrog offered Harley-Davidson access to a rights holder account in order to monitor and disable designs incorporating its marks and "requested a small modicum of cooperation from [Harley-Davidson] as to any additional keywords that should be monitored and as to the ways and channels in which [Harley-Davidson] was discovering the infringing activity." Id. ¶ 57. Harley-Davidson retorts that SunFrog's efforts have been lacking, noting that it found infringement through quick, easy searches of the All Art database, by clicking on links for infringing products that it had already disclosed to SunFrog, through searches of Facebook, including SunFrog sellers' Facebook pages that previously advertised infringing products, and Google searches using the combinations of the term "SunFrog" and the H-D Marks. None of this searching involved extensive efforts and none used any special technology.
Carol believes that SunFrog has attempted to handle all complaints from all parties, including Harley-Davidson, in the most expedient and effective manner possible. He seems particularly irked that Harley-Davidson did not communicate at all with SunFrog before filing this lawsuit other than through use of SunFrog's online infringement reporting tool.
3. ANALYSIS
The Court observed last year that this is a fairly straightforward case of counterfeiting. (Docket # 33 at 3). Nothing about the development of the evidence changes the Court's view. This includes SunFrog's plea that it is working hard to improve its anti-infringement policies and procedures.
*1024 Genuine as those efforts may be, federal law did not and does not require Harley-Davidson to wait and see whether they will bear fruit.
Additionally, SunFrog advances many of the same legal defenses that the Court considered and rejected in the context of its motion to dismiss. Those theories continue to be wholly without merit, as the Court shall explain a second time. Ultimately, it seems SunFrog's business was built, at least initially, atop the slender reeds of these legal defenses, not on meaningful work to combat infringement.
3.1 Failure to Take Discovery
One refrain in SunFrog's submissions that can be quickly disposed of at the outset is that summary judgment is improper because "no discovery has been taken." (Docket # 50 at 14-15). SunFrog is certainly right that many of the questions that arise in trademark cases are fact-intensive. SunFrog also seems to be correct that, as of the filing of Harley-Davidson's motion, neither party had sought significant discovery from the other. See id. at 15. Earnest discovery efforts appear to have begun only after the present motion was fully briefed. See (Docket # 66).
But why does this matter? Harley-Davidson submitted its own evidence in connection with its motion as required by the federal and local summary judgment rules, including several lengthy, detailed affidavits and many hundreds of pages of documents. See Fed. R. Civ. P. 56(c)(1) ; Civ. L. R. 56(b)(1)(C)-(D); (Docket # 46, # 47, # 48, # 49, # 54, # 55, # 56). SunFrog cites no rule, case, or other authority suggesting that Harley-Davidson cannot rely solely on its own evidence or, conversely, that Harley-Davidson was required to seek discovery from SunFrog in order to prove its claims. Indeed, conservation of resources would counsel against such efforts, if Harley-Davidson believed that it already possessed all the evidence it needed to succeed. See Waterloo Furniture Components, Ltd. v. Haworth, Inc. , 467 F.3d 641, 648 (7th Cir. 2006) (" Rule 56 does not require that discovery take place in all cases before summary judgment can be granted. In fact, this Court has noted that 'the fact that discovery is not complete-indeed has not begun-need not defeat [a motion for summary judgment].' ") (quoting Am. Nurses' Ass'n v. Illinois , 783 F.2d 716, 729 (7th Cir. 1986) ).
As every law student can recite, once Harley-Davidson submitted its motion and accompanying evidence, the burden then shifted to SunFrog to show that the proffered evidence was somehow incorrect or incomplete, leaving genuine questions of material fact to be answered at trial by the jury. Fed. R. Civ. P. 56(c)(1) ; Civ. L. R. 56(b)(2)(B)-(C). It could have done so by submitting evidence gathered from its own witnesses or from Harley-Davidson by way of depositions and discovery requests. It had many months in which to gather this evidence-discovery has been open since at least July 2017-but chose not to.
That failure cannot be laid at Harley-Davidson's feet. The non-moving party on summary judgment bears the burden to proffer evidence raising genuine disputes for trial. As the Supreme Court explained long ago in Anderson ,
[t]he movant has the burden of showing that there is no genuine issue of fact, but the [non-movant] is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56 [ (c) ] itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.
*1025 Anderson , 477 U.S. at 256, 106 S.Ct. 2505. Consistent with this approach, our Court of Appeals has "consistently held that summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.' " Steen v. Myers , 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting Hammel , 407 F.3d at 859 ).
Moreover, to the extent SunFrog implores that it did not engage in discovery because of the now-defunct prospect of settlement, the Court is unsympathetic. SunFrog and its counsel well understood the risk that taking no discovery would leave it vulnerable to summary adjudication. Again, the Anderson Court addressed a similar contention in 1986 when it said, "the [non-movant] must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the [movant], as long as the [non-movant] has had a full opportunity to conduct discovery." Id. at 257, 106 S.Ct. 2505.
Finally, conspicuously absent from SunFrog's submissions is any reference to Rule 56(d), which allows a party to avoid summary judgment on the ground that it cannot presently offer the facts necessary to justify its opposition. Fed. R. Civ. P. 56(d). The Rule provides that if the non-moving party makes this showing, the court can deny the motion or defer its consideration while the non-movant gathers the evidence it needs. Id. But proper resort to Rule 56(d) generally requires the non-movant to submit an affidavit, normally from counsel, specifying the reasons why additional discovery is needed and why it could not have been done sooner. Id. SunFrog nowhere cited Rule 56(d), nor did it submit an affidavit in conformity with the Rule. Kallal v. CIBA Vision Corp., Inc. , 779 F.3d 443, 446 (7th Cir. 2015) (failure to file Rule 56(d) affidavit "fully justifie[s]" denial of relief).
And even if the Court forgave the failure to submit the affidavit described in the Rule's text-a choice which is committed to the Court's sound discretion, Woods v. City of Chicago , 234 F.3d 979, 990 (7th Cir. 2000) -also absent from SunFrog's brief is a cogent and persuasive explanation as to why it has not yet been able to gather the facts it needed to oppose Harley-Davidson's motion. The Seventh Circuit has held that although "[a] court may disregard a failure to formally comply with Rule 56 [ (d) ]," the opposing party's request for a continuance must "clearly set[ ] out the justification for the continuance." Pfeil v. Rogers , 757 F.2d 850, 856 (7th Cir. 1985). "When a party fails to secure discoverable evidence due to his own lack of diligence," the necessary justification is lacking, and "it is not an abuse of discretion for the trial court to refuse to grant a continuance to obtain such information." Id. at 857.
Standing alone, the parties' refusal to engage in discovery is no reason at all to deny summary judgment. Having set aside that puzzling contention, the Court proceeds to the merits of the claims on which Harley-Davidson seeks judgment as a matter of law.
3.2 Liability for Trademark Infringement and Dilution
Harley-Davidson seeks only partial summary judgment in the present motion. It asks for a finding of liability and a permanent injunction on its federal and state trademark claims, which include claims of infringement, counterfeiting, false designation of origin, unfair competition, and dilution. Additionally, on the counterfeiting claim, Harley-Davidson requests an award of statutory damages.
*1026 Compensatory damages as to the other trademark claims are not sought in this motion, nor are judgment or damages sought with respect to Harley-Davidson's claim of copyright infringement. See (Docket # 44 at 4 n.1). The Court will address the trademark claims below.
3.2.1 Infringement, Counterfeiting, Unfair Competition, and False Designation of Origin
The Lanham Act prohibits the use of a "reproduction, counterfeit, copy, or colorable imitation" of a registered trademark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). There is a similar prohibition relating to unregistered marks. Id. § 1125(a)(1)(A). That Section prohibits the use of an unregistered mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." Id. Thus, the test for infringement of unregistered or registered trademarks is the same: likelihood of confusion. See Smith Fiberglass Prods., Inc. v. Ameron, Inc. , 7 F.3d 1327, 1329 (7th Cir. 1993).
For infringement to rise to the level of counterfeiting, the defendant's mark must be "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d). A counterfeit is defined as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Id. § 1127.
Claims for trademark infringement and unfair competition under Wisconsin law are governed by the same likelihood-of-confusion test. See Nat'l Football League Props., Inc. v. ProStyle, Inc. , 16 F.Supp.2d 1012, 1014-15 (E.D. Wis. 1998) ; Patterson v. TNA Ent'mt, LLC , No. 04-C-0192, 2006 WL 3091136, at *21 (E.D. Wis. Oct. 27, 2006). Further, claims for trademark infringement are identical under Wisconsin statutory and common law, Foamation, Inc. v. Wedeward Enters., Inc. , 970 F.Supp. 676, 689 (E.D. Wis. 1997), as are claims for unfair competition, Echo Travel, Inc. v. Travel Assoc., Inc. , 870 F.2d 1264, 1266 (7th Cir. 1989) ; Thermal Design, Inc. v. Am. Soc'y of Heating Refrigerating & Air-Conditioning Eng'rs , Inc., No. 07-C-765, 2008 WL 1902010, at *8 (E.D. Wis. Apr. 25, 2008). SunFrog does not dispute the congruence of federal and state law on these issues. See (Docket # 50 at 32-33). Thus, the Court's analysis of infringement, likelihood of confusion, and SunFrog's defenses thereto will be unitary.
Before assessing the likelihood of consumer confusion, the first step in any trademark case is to determine whether the plaintiff's trademarks are protectable. Packman v. Chicago Tribune Co. , 267 F.3d 628, 638 (7th Cir. 2001). Here, it is undisputed that Harley-Davidson owns valid and protectable trademark rights in each of the H-D Marks. It owns federal trademark registrations for each of the H-D Marks, except HD, for motorcycles. It also owns federal registrations for the marks HARLEYDAVIDSON, HARLEY, HD, H-D, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo for apparel; for the marks HARLEY-DAVIDSON, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo for mugs; and for the marks HARLEY-DAVIDSON, H-D, HD, Bar & Shield Logo, Willie G. Skull Logo, and Number 1 Logo covering hats. All of these registrations except one are "incontestable," which constitutes conclusive evidence *1027 of Harley-Davidson's ownership of and exclusive rights to use such marks in commerce for the goods recited in the registration, 15 U.S.C. § 1115(b), and the other registration is prima facie evidence that the registered mark is valid, id. § 1115(a). In addition, Harley-Davidson has common law rights in all of the H-D Marks for apparel, mugs, hats, and other goods based on its use of those marks in connection with such goods for many years. Thus, the protectability of the trademarks is generally not at issue, save in a few narrow respects that will be discussed below.
The parties' disputes center on SunFrog's legal defenses, including threshold questions of whether its marks are counterfeit and whether it is "using" the marks in the trademark sense. The parties also disagree as to whether there is a likelihood of confusion between Harley-Davidson's and SunFrog's uses of the marks, and whether SunFrog's business is immune from liability because of its anti-infringement policies, procedures, and technologies. The Court will address each of these topics in turn. Overarching the entire analysis is the principle that while trademark cases often raise triable questions of fact, summary judgment is nevertheless appropriate "if the evidence is so one-sided that there can be no doubt about how the question[s] should be answered." Door Sys., Inc. v. Pro-Line Door Sys., Inc. , 83 F.3d 169, 171 (7th Cir. 1996).
3.2.1.1 Counterfeiting
First, SunFrog claims that this is not a counterfeiting case at all because the parties' products are of substantially different quality and are readily distinguishable by consumers. (Docket # 50 at 17). In this instance, SunFrog turns Harley-Davidson's stringent quality-control standards against it, arguing that genuine, licensed goods have a "uniquely high quality," whereas the goods sold by SunFrog "broadcast an obviously amateur style." Id. Moreover, consumers encountering SunFrog's products online would recognize them as user-generated, not professional quality. Id. at 18. At a minimum, says SunFrog, in light of the vast differences in item quality, consumers would not find the marks used on genuine Harley-Davidson products and its products to be "substantially indistinguishable" when viewed in context. Id. Consequently, though this might be a case about ordinary trademark infringement, it is not about counterfeiting. See id. at 18-19. (This difference is hugely important, as statutory damages are only available in counterfeiting cases. See infra Part 3.3.1.)
The problem with this argument is that the counterfeiting inquiry is not focused primarily on the quality of the goods bearing the subject marks. Indeed, most classic cases of counterfeiting involve a famous mark being applied to a shoddy product. The more pertinent question is whether the marks, not the goods, are substantially identical. Of course, "[w]hen attempting to determine if two marks are similar, the comparison should be made 'in light of what happens in the marketplace, [and] not merely by looking at the two marks side-by-side.' " Ty, Inc. v. Jones Grp., Inc. , 237 F.3d 891, 898 (7th Cir. 2001) (quoting Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc. , 128 F.3d 1111, 1115 (7th Cir. 1997) ). District court decisions from outside this Circuit echo this view, noting that the genuine and counterfeit goods must be compared as they appear in the marketplace, not in the abstract. See, e.g., Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc. , No. 12 Civ. 5423(LAP), 2015 WL 150756, at *2 (S.D.N.Y. Jan. 12, 2015) ;
*1028 Colgate-Palmolive Co. v. J.M.D. All-Star Import & Export Inc. , 486 F.Supp.2d 286, 289 (S.D.N.Y. 2007) ; GMA Accessories, Inc. v. BOP, LLC , 765 F.Supp.2d 457, 472 (S.D.N.Y. 2011). Yet a careful reading of those opinions reveals that although the products themselves are part of the comparison, the central focus is on the appearance of the marks in the context of the products.
In any event, the idea that the products themselves need to be compared does not help SunFrog much. SunFrog offers no specifics on how their products or marks differ from Harley-Davidson's licensed offerings provided in the record. It rests instead on generalizations about product quality and auguries about what prospective buyers will think when seeing the goods in the marketplace. This is not what summary judgment should look like, and the Court will not scour the record for evidence and argument helpful to SunFrog. See Anderson v. Hardman , 241 F.3d 544, 545-46 (7th Cir. 2001) ; Stransky v. Cummins Engine Co., Inc. , 51 F.3d 1329, 1335 (7th Cir. 1995) ("The federal courts will not invent legal arguments for litigants.").
Despite SunFrog's failure to do more than gesture at the idea that its goods are not counterfeits, the Court undertook the task of reviewing each mark against each alleged infringing product. See (Docket # 49-1). There is no doubt in the mind of the Court that this is a counterfeiting case. In nearly every instance, though font sizes, colors, sizes, and shapes are altered, the words "Harley-Davidson" or another of its word-marks appear, either alone or alongside a logo like the Bar & Shield, Willie G. Skull, or Number 1 logos. While technically different in some respects, SunFrog's uses of the marks are substantially indistinguishable from the registered marks in terms of their appearance in context. If some are more obvious knockoffs than others, again, SunFrog has not taken the opportunity to examine them in any detail.
And the fact remains that a counterfeiter cannot escape liability simply by reproducing protected marks on poor products. This would create perverse incentives for infringers and leave Harley-Davidson without the power to police the use of its marks in many instances. Rejecting an identical argument, the court in Coach, Inc. v. Treasure Box, Inc. , No. 3:11 CV 468, 2013 WL 2402922 (N.D. Ind. May 31, 2013), explained:
it simply cannot be the case that an admitted purveyor of knockoff goods who intended to profit from their sale can claim that it did not intend to infringe merely because the goods it offered were of such terrible quality that no one could possibly think they were the real thing. Rather, an intent to "exploit consumers' associations with" the genuine article, or to profit from the goodwill associated with holder of the trademark, is sufficient.
Id. at *4.
When viewed in their commercial context, there can be no mistake that SunFrog's use of the H-D Marks is an effort to pass off SunFrog's goods as genuine, licensed Harley-Davidson products. Conversely, courts are hesitant to find counterfeiting where the infringer is not trying to pass off his products as another's, such as when the parties' products are very different. Audemars helps make the point. Audemars Piguet , 2015 WL 150756, at *2. There, two watch manufacturers were involved in a trademark dispute arising from a particular type of bezel employed on a watch face. Id. The court found that the similarities between the subject watches were not enough to rise to the level of counterfeiting. Id. One key difference was that each watch bore the name of the manufacturer. Id. Thus, it was clear that the defendant was not trying to pass off its goods as those of the plaintiff. Id. Instead, *1029 at worst his product was confusingly similar. Id. Put differently, each company was trying to be its own brand but in so doing adopted similar product designs or features. Id.
Here, by contrast, only one conclusion can be drawn from viewing Harley-Davidson's products against SunFrog's: SunFrog is trying to dupe consumers into thinking that they are buying a genuine licensed article when they are not. Like the store in Coach that sold knockoff Coach bags, here it is "clear that the Defendants were looking to capitalize on the [Harley-Davidson] name and the demand for [Harley-Davidson] products-and the esteem that they hold in the marketplace-in selling the knockoff [Harley Davidson] items." Coach , 2013 WL 2402922, at *4.
Nor does it matter, as SunFrog seems to believe, that purchasers go to SunFrog's website to purchase these goods. (Docket # 50 at 18-19). SunFrog attributes a great deal of savvy to the users of its website, contending that they all know that SunFrog sells only user-generated designs that are obviously unlicensed. Id. For genuine Harley-Davidson goods, SunFrog says, a buyer would know to go to Walmart.com or some other licensed dealer. Id.
The Court is not convinced. First, the only evidence SunFrog offers to support its beliefs as to what its consumers know is the affidavit of its corporate counsel. See id. ; (Docket # 52 ¶ 60). He may have personal knowledge of many aspects of SunFrog's business model and practices, but how he knows the minds of SunFrog website users, he does not say. Second, SunFrog's argument cuts as easily against it as it does in its favor. How is the average consumer to know that Walmart offers licensed Harley-Davidson goods but SunFrog does not? Could SunFrog not have bought a license to use Harley-Davidson's trademarks? It has done so for other major brands like Marvel and Disney. (Docket # 50 at 30).
Finally, SunFrog ignores the longstanding principle that trademark law protects against confusion both at the point of sale and in the post-sale context. CAE, Inc. v. Clean Air Eng'g , 267 F.3d 660, 683 (7th Cir. 2001). Thus, even if one buys SunFrog's claim that the consumer who purchases a Harley-Davidson shirt on SunFrog's website knows that it is a knockoff, other potential consumers of Harley-Davidson products who see him wearing that shirt would have no reason to suspect a fake, and seeing a cheaply made product may put them off from future purchases of genuine Harley-Davidson goods. The Lanham Act proscribes this latter form of confusion to the same extent as the former. Id. In the end, SunFrog's self-deprecation does nothing but distract from the unavoidable conclusion that this is a counterfeiting case.
3.2.1.2 Use in Commerce and Ornamental Use
Next, SunFrog tries to divert liability from itself to its users by contending that it does not itself "use" the marks in commerce, nor does it use them as trademarks. (Docket # 50 at 19-23). On the first point, there is little need for extended discussion. In SunFrog's view, it has never used any of Harley-Davidson's marks, whether placing them on products or in advertising; instead, only its users do so. Hence, SunFrog hides behind the "user-generated" nature of its products, the automation of its printers, and its anti-infringement tools. See (Docket # 57 ¶ 48). Yet SunFrog maintains the All Art database, advertises infringing designs and trains and encourages others to do so, owns and runs its automated printers that print the infringing designs onto physical goods, handles products after they come *1030 off of the printers, bags and ships those products, and processes payment. This is use in commerce. 15 U.S.C. § 1127 ("use in commerce" requires that the mark be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto" and that the goods "are sold or transported in interstate commerce").
The second point-that SunFrog makes mere "ornamental" use, not trademark use, of the marks-is equally misguided. The notion that a logo, word, or other designation needs to be used as a trademark "is not a necessary element of a trademark infringement claim." Univ. Healthsystem Consortium v. UnitedHealth Grp., Inc. , 68 F.Supp.3d 917, 926 (N.D. Ill. 2014). However, if a designation is being used in a non-trademark fashion, "likelihood of confusion is highly unlikely." 1 McCarthy on Trademarks & Unfair Competition (" McCarthy") § 3:3 (5th ed. 2018). Put another way, " 'trademark use' is not a separate element of plaintiff's case, but is only one aspect of the likelihood of confusion requirement for infringement." 4 McCarthy § 23:11.50.
It is undeniable that SunFrog made a "trademark" use of the H-D Marks. SunFrog vigorously advertised and offered for sale goods bearing those marks. Upon request, it printed and shipped them to buyers. It kept most of the revenue. SunFrog used the H-D Marks to (falsely) identify its goods as coming from or being licensed by Harley-Davidson and to distinguish those goods from others'. This is use of the H-D Marks as trademarks. See 15 U.S.C. § 1127 (defining "trademark" as a designation used "to identify and distinguish [the user's] goods...from those manufactured or sold by others and to indicate the source of the goods"); Mattel, Inc. v. MCA Records, Inc. , 296 F.3d 894, 900 (9th Cir. 2002) (a trademark is "a word, phrase or symbol that is used to identify a manufacturer or sponsor of a good or the provider of a service").
True, the website users actually craft the designs that incorporate the marks. (Docket # 50 at 20). But this does not matter, as SunFrog's involvement standing alone constitutes use of the marks. Using a mark involves placing it "in any manner" on the goods in question or displays associated with them, 15 U.S.C. § 1127, and undoubtedly Harley-Davidson's marks were not maintained in the All Art database without SunFrog's effort, did not get onto SunFrog's goods without the use of SunFrog's own printers, nor did they make it to purchasers without being shipped by SunFrog.
Thus, SunFrog is actively involved in the infringing conduct. This makes it unlike the fashion showroom in GMA Accessories , on which it principally relies. There, the showroom merely housed finished goods bearing the plaintiff's mark; it did not manufacture the goods, label them with that mark, or actively try to sell them. GMA Accessories , 765 F.Supp.2d at 461. SunFrog, of course, not only advertises and offers infringing designs for sale and prints them onto products, it also ships the finished products and handles payment processing. Unlike the showroom, SunFrog exerts control over nearly every aspect of the advertising, sale, and manufacture of the infringing goods, save designing the mockups. By any measure, then, SunFrog uses the H-D Marks.[13]
*1031 Similarly, it is beside the point that SunFrog puts its own mark on the hangtags and labels of its goods. Id. Use of innocuous marks alongside infringing ones is not a recognized defense under the Lanham Act. Indeed, this circumstance arises often when a licensee puts its own mark on goods that also bear a licensed mark. There is no reason to believe that consumers, looking at a SunFrog shirt bearing both its mark on the hangtag and an HD Mark across the breast, would conclude that SunFrog did not intend to signify source, sponsorship, or affiliation by the use of the H-D Mark. The opposite inference is far more likely. Sands, Taylor & Wood Co. v. Quaker Oats Co. , 978 F.2d 947, 954 (7th Cir. 1992) ("[T]he conjunction of defendant's trademark and the allegedly infringed term 'may actually increase the misappropriation by linking defendant's name to plaintiff's goodwill.' "); Int'lKennel Club of Chicago, Inc. v. Mighty Star, Inc. , 846 F.2d 1079, 1088 (7th Cir. 1988) (the defendant's use of its house mark in conjunction with the plaintiff's mark "is a smoke screen and a poor excuse for the defendants' blatant misappropriation of the plaintiff's name, for even if fanciers of purebred dogs or stuffed toys attached any meaning to the defendants' house mark, they would necessarily believe that the International Kennel Club had licensed, approved or otherwise authorized the defendants' use of the International Kennel Club name").
Finally, the idea that mere "ornamental" use of a designation is not trademark use has no application here. This doctrine comes into play when, for instance, a clothing item bears a slogan or message, such as a hat emblazoned with the phrase "Swallow Your Leader." In re Power Play Int'l , Serial No. 75/431,077, 2003 WL 1695913, at *2 (T.T.A.B. Mar. 26, 2003). The question becomes whether the slogan, used in this way, "indicat[es] the source of the clothing on which it appears." Id. ; 1 McCarthy § 7:24.
Suggesting that this doctrine protects it here, SunFrog relies primarily on Tovey v. Nike, Inc. , No. 1:12CV448, 2014 WL 3510975 (N.D. Ohio July 10, 2014). There, the plaintiff owned a registration for the mark BOOM YO! for use on apparel. Id. at *4. Later, Nike developed an advertising campaign prominently featuring the word "boom." Id. at *5. The plaintiff sued for trademark infringement. Id.
In addressing Nike's argument that the asserted mark was merely ornamental, the court noted that a designation can be both ornamental and source-identifying. Id. at *8. However, the plaintiff's use of the phrase was confined to the former purpose. Id. at *9. He never displayed the phrase in a consistent font, size, design, color, or location on the goods, nor did he designate the phrase as a trademark. Id. Moreover, he did not place the phrase on the hang tags or labels for his goods. Id. Thus, the court found that he had not used the phrase in a trademark sense, despite the presumption that it was a valid trademark by virtue of its registration. Id.
All this may sound helpful to SunFrog, but it fails to apply these general principles to the case at hand. Specifically, SunFrog does not show which of the H-D Marks it claims to have used in a purely ornamental fashion. Without doubt, the majority of Harley-Davidson's word-marks are source indicators-they have the company's name in them. Maybe SunFrog is claiming that one or more of Harley-Davidson's logos are susceptible to challenge under the reasoning of Tovey ? The *1032 Court might surmise, for instance, that SunFrog does not think the presence of a skull or the number "1" on a t-shirt, standing alone, signifies Harley-Davidson as the source or sponsor of the clothing. But the Court is not in the business of teasing out nuanced analyses from paltry offerings. It will not review the asserted marks against the infringing products to decide what SunFrog should have or meant to say. See Anderson , 241 F.3d at 545-46 ; Stransky , 51 F.3d at 1335.
This failure on SunFrog's part also distinguishes the present case from Tovey . There, the court took pains to note that registered trademarks are presumptively valid. Id. at *8. But on the particular facts of that case, including detailed evidence about the history and usage of the BOOM YO! phrase, the court was obliged to conclude that the presumption of validity had been rebutted. Id. at *9. SunFrog's evidence comes nowhere close to that marshalled in Tovey ; indeed, SunFrog does not bother to discuss even a single mark with any specificity. For that reason, the Court finds SunFrog cannot rely on the ornamental-use doctrine.
3.2.1.3 Likelihood of Confusion
The Court next turns to the heart of any trademark case: the likelihood of confusion. Counterfeiting creates a presumption of a likelihood of confusion because the defendant's products are likely to confuse consumers when the marks on those products are identical to or closely resemble the plaintiff's marks. See Microsoft Corp. v. Rechanik , 249 Fed.Appx. 476, 479 (7th Cir. 2007) ; Polo Fashions, Inc. v. Craftex, Inc. , 816 F.2d 145, 148 (4th Cir. 1987) ; Coach , 2013 WL 2402922, at *4 (collecting cases). A presumption of confusion in counterfeiting cases is "entirely sensible[,] since the only reason people sell counterfeit merchandise is to piggyback on a designer item's popularity and then profit from it in the process." Coach , 2013 WL 2402922, at *4.
SunFrog asserts that there remain genuine issues of material fact as to the likelihood of confusion. (Docket # 50 at 23-27). This argument seems to rest on the incorrect assumption that this is not a counterfeiting case and that a likelihood of confusion is therefore not presumed. Of course, the presumption of confusion is rebuttable, see Coach , 2013 WL 2402922, at *5, so the Court will consider whether SunFrog's proffered evidence overcomes it.
The Seventh Circuit considers the following factors to determine whether consumers are likely to be confused: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and (7) the intent of the defendant to "palm off" his product as that of the plaintiffs. Ty , 237 F.3d at 897. No single factor is dispositive, "although, in many cases, the similarity of the marks, the defendant's intent, and actual confusion are particularly important." Packman , 267 F.3d at 643. The likelihood-of-confusion test has been characterized as "equitable," meaning that courts may assign varying weights to each factor as the facts demand it. Barbecue Marx, Inc. v. 551 Ogden, Inc. , 235 F.3d 1041, 1044 (7th Cir. 2000). While the existence of a likelihood of confusion is generally a question of fact, it can be resolved on summary judgment where, considering all seven factors collectively, no reasonable jury could find in the non-movant's favor. See Sorensen v. WD-40 Co. , 792 F.3d 712, 732 (7th Cir. 2015) ; AutoZone, Inc. v. Strick , 543 F.3d 923, 929 (7th Cir. 2008).
Harley-Davidson contends that all seven factors strongly favor it, since: (1) the parties'
*1033 marks are identical or materially indistinguishable; (2) the parties offer identical products; (3) both parties sell such products to the general public, including online; (4) ordinary and perhaps even sophisticated consumers cannot distinguish the identically-branded products; (5) the H-D Marks are strong and famous; (6) "actual confusion is presumed where the marks and products are identical"; and (7) SunFrog's intent to palm off their own products as Harley-Davidson's is clear based on its counterfeiting of the H-D Marks. (Docket # 44 at 9); Third Educ. Grp., Inc. v. Phelps , 675 F.Supp.2d 916, 924 (E.D. Wis. 2009) (likelihood of confusion is "self-evident" where the marks and products are identical or nearly so). The Court largely agrees with this assessment and finds that SunFrog's arguments to the contrary are unavailing.
In discussing several of the factors, SunFrog reiterates its belief that the lack of factual development in the record means that summary judgment is not appropriate. (Docket # 50 at 24-25). As explained above, what SunFrog does not do is offer persuasive reasons why this is so, or why it could not have taken the needed discovery itself. See supra Part 3.1. With that in mind, the Court turns to SunFrog's substantive arguments on each likelihood-of-confusion factor.
Strength and Similarity of Marks . First, says SunFrog, the H-D Marks are not strong. (Docket # 50 at 24, 26). Yet it discusses only the Willie G. Skull logo, ignoring the word-marks and other logos. See id. at 24. SunFrog complains that "[g]iven the pervasiveness of skull designs in the clothing industry, the volume of ill-defined marks asserted against SunFrog, and the poor-quality images transmitted to SunFrog in piecemeal correspondence, it is impossible to summarize the similarities and differences between the marks asserted by Plaintiffs and those Plaintiffs claim are infringing." Id. It cites no legal authority to support this position. Instead, it relies on the fact that there exist many registrations for marks incorporating some kind of skull design. Id. ; (Docket # 50-1).
Certainly, a suggestion that a mark is not distinctive is relevant to the present inquiry. Trademarks can be either inherently distinctive as source identifiers, or they can claim protection if they have acquired distinctiveness (also called "secondary meaning") through, for instance, long and well-known use in connection with a particular type of goods. 2 McCarthy § 11:2 ; Two Pesos, Inc. v. Taco Cabana, Inc. , 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). For the Willie G. Skull logo to receive trademark protection, Harley-Davidson must produce evidence of secondary meaning, as commonplace non-word designations generally are not inherently distinctive because they do not serve to identify the source of the goods. See Amazing Spaces, Inc. v. Metro Mini Storage , 608 F.3d 225, 242 (5th Cir. 2010) ; Seabrook Foods, Inc. v. Bar-Well Foods Ltd. , 568 F.2d 1342, 1344 (C.C.P.A. 1977). But Harley-Davidson has surely met that burden here, given the extensive evidence regarding the registration of the Willie G. Skull logo, its long-standing use with Harley-Davidson products, and its well-known status as an iconic Harley-Davidson symbol. CAE , 267 F.3d at 681 (courts may assess strength based on length of use of a mark, volume of sales, promotional expenditures, and whether dissemination is widespread); Autozone , 543 F.3d at 933 (Autozone's mark had "plenty of economic and marketing strength" where is was displayed in thousands of retail outlets nationwide, supported by millions in marketing expenditures, and in use for decades).
SunFrog's reference to the prevalence of skull-like marks in the federal trademark *1034 register does not meaningfully undermine the strength of Harley-Davidson's mark. See Door Sys. , 83 F.3d at 172 (trademark search bringing up several marks with "door" in them was neither surprising nor dispositive). It was SunFrog's burden on summary judgment to do more than raise metaphysical doubt as to the strength of the marks and the differences between the H-D Marks and the infringing products. Matsushita , 475 U.S. at 587, 106 S.Ct. 1348. That Harley-Davidson could have submitted more evidence showing both strength and similarity, such as expert analysis or consumer surveys, (Docket # 50 at 25), is beside the point. SunFrog could have done the same, and it cannot cover the gap by proffering conjecture and speculation. Amadio , 238 F.3d at 927 ; Palucki , 879 F.2d at 1572. In sum, there is no competent evidence raising a dispute as to whether the marks in question are protectable or that SunFrog's use of the marks anything short of "virtually identical" to their registrations. CAE , 267 F.3d at 678. As a result, this factor favors Harley-Davidson.
Similarity of the Products; Scope and Manner of Use . SunFrog next contends that its use of the marks is not concurrent with or comparable to Harley-Davidson's. (Docket # 50 at 25-26). It asserts:
The manner in which user-generated designs appear on SunFrog's website, the fact that any design is placed on a SunFrog branded shirt from the SunFrong.com [sic] website, and the users' expectation that the designs found there are user-generated, weighs against a finding that the designs created and uploaded by users of SunFrog's site create any real likelihood of consumer confusion that the t-shirts consumers choose to design and print on the SunFrog site somehow actually come from H-D.
Id. This is, again, unhelpful speculation and conjecture about the minds of consumers. Moreover, even if a user well understood that designs sold on SunFrog's website are user-generated, there is nothing to suggest that those designs are unlicensed. See supra Part 3.2.1.1. Harley-Davidson has shown that the parties' nearly identical products compete directly in the online marketplace. See Coach , 2013 WL 2402922, at *5 (noting that the infringer sold the same types of items as the mark owner precisely because it offered them as knockoffs of the real articles); CAE , 267 F.3d at 681 (courts look to whether the products are related in areas of promotion, sales, or distribution). That the products may not be identical because SunFrog's are cheaply made is not dispositive. Eli Lilly & Co. v. Nat. Answers, Inc. , 233 F.3d 456, 463 (7th Cir. 2000) (courts "are concerned only with whether [the products] are similar ," not whether they are the same) (emphasis in original). This factor weighs in Harley-Davidson's favor.
Degree of Care Exercised by Consumers . SunFrog writes only two sentences on this factor, suggesting that the high quality of Harley-Davidson's goods means that consumers of its products "are so discerning that a genuine H-D shirt is purchased with great care in contrast to the impulse buy of a user-generated shirt from SunFrog." (Docket # 50 at 26). This uncorroborated conviction about consumer care is out of sync with applicable precedent, which requires the Court to examine such matters "with reference to the realities of consumer behavior in the relevant market." See Dorr-Oliver, Inc. v. Fluid-Quip, Inc. , 94 F.3d 376, 381 (7th Cir. 1996). Even if one accepts that Harley-Davidson's licensed apparel is high-quality and more expensive than similar unlicensed apparel, it is indisputable that the average retail consumer will not exercise great care and discretion in buying ordinary apparel, *1035 see GB Elec. Inc. v. Thomas & Betts Corp. , Civ. A. No. 95-C-0426, 1995 WL 795660, at *6 (E.D. Wis. July 28, 1995), unlike, perhaps, costly Coach handbags, Coach , 2013 WL 2402922, at *6. Moreover, the degree of care must be assessed not only with respect to those discriminating consumers of Harley-Davidson goods, but also as to SunFrog's consumers, who in SunFrog's own estimation have a low level of sophistication. CAE , 267 F.3d at 682 ; Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha , 754 F.2d 591, 596 (5th Cir. 1985) (confusion for trademark purposes "encompasses confusion on the part of purchasers of either (or both) party's products") (emphasis in original). Furthermore, potential customers who view SunFrog's infringing products in a post-sale environment-that is, out in the world-would almost certainly mistakenly think the products are genuine. CAE , 267 at 683. Thus, this factor also suggests a likelihood of confusion.
Actual Confusion . Harley-Davidson offers no evidence of actual confusion to support its trademark claims. It contends that actual confusion can be presumed in this case because of the similarity of the products and marks, (Docket # 44 at 9), but cites no legal authority for this assertion. The presumption arising from the counterfeiting aspect of the case is distinct. Nevertheless, the Seventh Circuit has opined that "[a]lthough evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis,...this evidence is not required to prove that a likelihood of confusion exists." Id. at 685. This factor is neutral.
Palming Off . The final factor asks whether SunFrog intended to palm off the products it sold as those of Harley-Davidson. Barbecue Marx , 235 F.3d at 1046. This intent requirement "refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." Meridian Mut. Ins. Co. , 128 F.3d at 1120. As has been discussed at length already, it is eminently clear that SunFrog tried to pass off its products as genuine, licensed Harley-Davidson goods. This is true despite SunFrog's insistence that its goods are of poor quality and its consumers are smart enough to know that they are paying for fakes. See Coach , 2013 WL 2402922, at *7-8. The goods and marks are identical, or nearly so, which permits an inference of intent to confuse. Autozone , 543 F.3d at 934. Indeed, the intent to palm off is even more salient in light of the notoriety of Harley-Davidson's marks. See Sands, Taylor & Wood , 978 F.2d at 963 ; Eli Lilly , 233 F.3d at 465 (finding that obvious wrongful intent can be weighed heavily in the overall analysis).
Moreover, as observed above, whatever a SunFrog website user might think of the product they are buying, SunFrog could not (and does not) credibly contend that post-sale confusion is unlikely. The very purpose of buying a cheaper, knockoff version of a Harley-Davidson product on SunFrog's website is to create association with the iconic brand at a lower cost. See Coach , 2013 WL 2402922, at *8. This runs the risk that consumers viewing a knockoff post-sale will see the low quality of the item and be dissuaded from purchasing a real Harley-Davidson product. Id. SunFrog is responsible for this confusion and harm to Harley-Davidson's brand just as much as any point-of-sale confusion. CAE , 267 F.3d at 683 ; Hermes Int'l. v. Lederer de Paris Fifth Ave., Inc. , 219 F.3d 104, 108 (2d Cir. 2000) ; Rolex Watch, U.S.A., Inc. v. Canner , 645 F.Supp. 484, 495 (S.D. Fla. 1986).
Conclusion . SunFrog bore the burden to come forward with evidence raising a genuine dispute as to whether the presumption of confusion could be rebutted *1036 in this counterfeiting case. It did not meet that burden. The evidence instead confirms that SunFrog's "marks" are simply literal or stylized reproductions of Harley-Davidson's iconic word marks and logos, used on identical, inexpensive products, in similar channels of advertisement and distribution, and with the undeniable intent to pass off its goods as genuine. Likelihood of confusion may be a question for the jury in most cases, but because nearly all of the relevant factors weigh heavily in Harley-Davidson's favor, this case is the exception. CAE , 267 F.3d at 687 (affirming district court's finding that there was a likelihood of confusion as a matter of law where most factors weigh distinctly in the plaintiff's favor); Door Sys. , 83 F.3d at 172 ("Before [summary judgment] can properly be granted,...the court must have a very high degree of confidence that any disagreement over the facts is spurious.").
3.2.1.4 The Tiffany Defense
Convinced that it cannot be liable for direct trademark infringement, an assumption which the Court has shown to be mistaken, see supra Parts 3.2.1.1-3.2.1.2, SunFrog next raises a defense to liability for contributory infringement. In Inwood Laboratories, Inc. v. Ives Laboratories, Inc. , 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), the Supreme Court concluded that contributory infringement occurs when a service provider "intentionally induces another to infringe a trademark" or if the service provider "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement."
SunFrog's defense to this species of trademark liability is grounded in the Second Circuit's 2010 decision in Tiffany (NJ) Inc. v. eBay, Inc. , 600 F.3d 93 (2d Cir. 2010). In that case, the Second Circuit addressed a claim brought by the famous jewelry maker against the online marketplace. It was undisputed that sellers using eBay were listing large numbers of counterfeit Tiffany jewelry pieces and that eBay knew this was occurring. Id. at 97. But eBay never saw or inspected the merchandise sold on its website, since transactions on eBay are consummated directly between seller and buyer; thus, its ability to assess whether an item was infringing and to stop it in transit was difficult. Id. Moreover, eBay implemented a robust anti-counterfeiting scheme, with notice-and-takedown measures, a three-strikes rule against repeat-offending sellers, and a specialized search engine that could be used to identify infringing products. Id. at 98-99.
As a result, the Second Circuit concluded that eBay was not contributorily liable for the infringing acts of its users. Id. at 107. It was not enough that eBay had "a general knowledge or reason to know that its service [was] being used to sell counterfeit goods." Id. Instead, eBay needed to have a particularized knowledge of who was infringing and who would do so in the future. Id. at 109. Moreover, there was insufficient evidence that eBay was being willfully blind to the counterfeit sales on its site. Id. at 110.
SunFrog says it is identical to eBay because it has an "industry standard notice and takedown procedure." (Docket # 50 at 29). It therefore believes that it should be immune to contributory liability. Yet the disconnect between SunFrog's business and eBay's is hard to overstate. First and foremost, SunFrog is not on the hook in this case for contributory infringement, as was the focus in Tiffany . Rather, because SunFrog advertises and sells infringing products, operates printers that print the products, packs them for shipping, ships them, and then processes payment, it is directly liable.
Recall that eBay does not make anything, nor does it take goods into its custody *1037 for shipping. Sellers offer goods that they have bought or made. They then ship them to buyers. eBay has little involvement besides bringing the parties together for a fee. In fact, eBay had only used Tiffany's trademarks on its website to advertise products; it did not make any jewelry nor did it suggest that Tiffany sponsored or endorsed the products it advertised. Tiffany , 600 F.3d at 102-03. As a result, the Court of Appeals found that there could be no direct trademark liability arising from eBay's limited use of the marks. Id. SunFrog occupies the opposite posture, as it does most of the legwork in the transaction for an infringing item, including physically placing the H-D Marks on products. If SunFrog is like eBay in the sense that its users, and not SunFrog, are the ones generating infringing designs, there the similarities end.
What is most troubling about the Tiffany defense here is that the Court has already rejected it once. In its order denying SunFrog's motion to dismiss, the Court explained that, unlike eBay, "SunFrog operates the very printers that print infringing goods, and it does not appear to offer resale of goods." (Docket # 40 at 5 n.2). Thus, "[i]ts claim to innocence is far more tenuous than eBay's." Id. "Indeed," explained the Court, "eBay would have been hard-pressed to defend itself from Tiffany if eBay not only provided a platform for the sale of counterfeit [jewelry] but also ran the [ ] shop that made [it]." Id. ; see also Tre Milano, LLC v. Amazon.Com, Inc. , B234753, 2012 WL 3594380, at *11 (Cal. Ct. App. Aug. 22, 2012) (absolving Amazon in hosting sellers of counterfeit goods "because Amazon is a service provider, not the seller. Amazon did not currently have any [infringing goods] in its own inventory; those it sold belonged to third party sellers. That Amazon provided the product description and handled the payments did not make it a direct seller of the products."); Milo & Gabby, LLC v. Amazon.com, Inc. , No. C13-1932RSM, 2015 WL 4394673, at *8-9 (W.D. Wash. July 16, 2015).[14]
Undeterred, SunFrog has resurrected the Tiffany defense in opposition to the instant motion. Without directly addressing the Court's earlier decision, SunFrog seems to suggest it was wrong, arguing that printing physical products is not analytically distinguishable from the offering of digital products, which is how it characterizes eBay's business. (Docket # 50 at 30). But this contention, too, relies on the misguided notion that SunFrog is merely a print-on-demand service. Id.
The Court earlier addressed this claim. "[W]hatever the size or scope of SunFrog's business, it can be charged with knowing what goods come off of printers that it owns and operates." (Docket # 40 at 8). "Put differently," said the Court, "SunFrog equates itself with a vending machine, producing products at a customer's order without oversight. But the point of this case is that SunFrog in fact operates like a self-aware vending machine, with the ongoing ability to monitor the products its users order (and that it creates) and to know that those products are infringing." Id. at 9 (citation omitted). Without deciding whether an "entirely automated and user-directed" printing service can be liable for printing infringing products, (Docket # 50 at 30), SunFrog's business simply cannot be described in this way.[15]
*1038 Put differently, it is uncontested that one aspect of SunFrog's business is supplying the service of designing custom-made apparel. Yet its business goes much further, since it participates in the manufacture and distribution of those products as well. Indeed, the Court agrees with SunFrog that "physicality of the outcome of the service is not the locus of the analysis," (Docket # 50 at 30), but that is half the story. This case is not like most contributory infringement suits, where the defendant supplies a product to another whom he knows will infringe. See Inwood Labs. , 456 U.S. at 854, 102 S.Ct. 2182. Instead, SunFrog itself is performing the infringing conduct. As a result, Tiffany offers SunFrog no respite.
Nor does it matter that many of the designs offered on SunFrog's website never translate into physical products. At first glance, this appears to bring SunFrog's situation closer to Tiffany , as it evokes eBay's contention that it only hosted sellers who posted infringing listings, with no involvement in the creation of those listings other than advertising them. Tiffany , 600 F.3d at 102-03. As the Second Circuit found, this use was too attenuated to give rise to direct liability. Id.
Yet the analogy to Tiffany still fails on the facts. It is undisputed that SunFrog is deeply and indispensably involved in the creation of its design listings, including offering the software to make them, holding prior designs for later use in the All Art database, and aggressively advertising those listings through Facebook and other social media. Moreover, SunFrog nowhere claims that it would not have produced a listed item if it was ordered. Indeed, the opposite is true since, as SunFrog stresses at every opportunity, its process is "entirely automated" and its printers print on-demand. (Docket # 50 at 30). Thus, the listings on SunFrog's website would ineluctably lead to the manufacture of infringing products.[16]
These considerations take SunFrog well outside of Tiffany , where eBay simply hosted and advertised listings created by others to enable sales consummated entirely without eBay's involvement. In other words, whereas eBay was not the entity offering Tiffany jewelry for sale, SunFrog undoubtedly is the seller of the apparel and other items on its website. This brings it within the broad definition of counterfeiting in the Lanham Act, which includes *1039 not only making but also offering counterfeit goods for sale. 15 U.S.C. § 1116(d).
Furthermore, even assuming SunFrog could bring itself within the conceptual framework of Tiffany and avoid direct liability for instances in which only a website listing, and not a physical product, is the hook for infringement, it would still fail to meet the requirements of the Tiffany defense. Recall that in Inwood , the Supreme Court concluded that contributory infringement occurs when a service provider "intentionally induces another to infringe a trademark" or if the service provider "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement." Inwood Labs. , 456 U.S. at 854, 102 S.Ct. 2182. The Tiffany court analyzed only the second of these two avenues, as Tiffany did not contend that eBay induced sellers to infringe. Tiffany , 600 F.3d at 106. The Court of Appeals determined that the "reason to know" standard of Inwood requires "more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." Id. at 107. Thus, Tiffany could not rest on a generalized problem of infringement, which eBay addressed by taking down identified infringing listings. Id. at 109. Rather, it should have identified sellers that were then selling or would sell counterfeit goods. Id.
The Court of Appeals further explained that liability can also arise where the service provider, although it does not have specific knowledge about a particular would-be infringer, "had reason to suspect that counterfeit [ ] goods were being sold through its website, and intentionally shielded itself from discovering the offending listings or the identity of the sellers behind them[.]" Id. Relying on Seventh Circuit precedent espousing a similar view, the court said that "[w]hen it has reason to suspect that users of its service are infringing a protected mark, [a service provider] may not shield itself from learning of the particular infringing transactions by looking the other way." Id. (citing Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc. , 955 F.2d 1143, 1149 (7th Cir. 1992) ). In the Seventh Circuit, such willful blindness is the equivalent of actual knowledge for purposes of trademark infringement. Hard Rock Café , 955 F.2d at 1149 ; Louis Vuitton S.A. v. Lee , 875 F.2d 584, 590 (7th Cir. 1989) (finding that "willful blindness is knowledge enough" to prove willfulness).
Willfulness generally, and willful blindness in particular, are factors often discussed in relation to awarding statutory damages. See Rechanik , 249 Fed.Appx. at 479 ; Wildlife Exp. Corp. v. Carol Wright Sales, Inc. , 18 F.3d 502, 511 (7th Cir. 1994). In that context, courts find that infringement is willful when the infringer knows that its conduct constitutes infringement or acts "in reckless disregard" of the owner's rights. Wildlife Exp. Corp. , 18 F.3d at 511 ; Lorillard Tobacco Co. v. S & M Cent. Serv. Corp. , No. 03 C 4986, 2004 WL 2534378, at *4 (N.D. Ill. Nov. 8, 2004). This can be inferred from a defendant's conduct, including, for instance, that the "defendant ignored the plaintiff's notices[,] did not seek advice of an attorney, and passed the matter off as a nuisance." Lorillard , 2004 WL 2534378, at *4. The Seventh Circuit has cautioned that " 'ostrich-like' business practices amount to willful blindness." Rechanik , 249 Fed.Appx. at 479.
These precedents spell doom for SunFrog's head-in-the-sand approach to infringement. First, SunFrog actively markets products bearing infringing designs through social media sites like Facebook, and it encourages and trains its sellers to *1040 do so as well. Indeed, the company makes three-quarters or more of its profits through Facebook ad referrals. SunFrog also allows sellers to access the All Art database to retrieve infringing designs and peddle goods bearing those designs. Arguably, then, it actively induces infringement in the Inwood sense by encouraging users to go to its website and create and order infringing goods (which, of course, SunFrog itself prints). Inwood , 456 U.S. at 854, 102 S.Ct. 2182.
Second, with respect to the "reason to know" prong of Inwood , SunFrog has turned a blind eye to the infringement plaguing its business. At the front end, it failed to stop repeat infringers despite knowing their identities as a result of numerous takedown notices. Harley-Davidson submitted seventy notices in just a few months, covering over 800 infringing products. Those were removed, but identical or similar designs popped up again just as quickly, often by the same designers or sellers. Moreover, the removal process frequently took days, despite Harley-Davidson providing direct links to the offending pages. And all the while, SunFrog expanded its apparel offerings, which served to make the infringement more pervasive.
SunFrog counters that it had difficulty reviewing the surge of new designs submitted each day, sometimes numbering in the hundreds of thousands, and in responding to the numerous takedown requests it received. While SunFrog's conduct shows that Harley-Davidson's notices were not literally ignored, SunFrog failed time after time to develop reforms to its practices that actually addressed the problem in a meaningful way. However sunny a view it takes of its efforts to improve its anti-infringement apparatus, the apparatus simply did not work.[17] This passage from SunFrog is telling:
SunFrog does not dispute that its anti-infringement tools have developed over time and that the system has not been perfect. SunFrog's anti-infringement tools have, however, become much more powerful and SunFrog is currently focusing those powers on users who may infringe upon Plaintiffs' asserted rights.
(Docket # 51 ¶ 85). Trademark law is not concerned with attempt to avoid infringement; it is execution that matters. Ohio State Univ. v. Skreened Ltd. , 16 F.Supp.3d 905, 917 (S.D. Ohio 2014) ("Selling knockoffs is selling knockoffs, regardless of who suggested you sell them, regardless of how many other infringing products you decide not to sell, and regardless of how much of a hassle it is to comply with the law."). SunFrog's pleas for leniency are not congruent with the Lanham Act or SunFrog's own repeated misconduct. Notably, this is not the first time SunFrog has been sued for trademark infringement in the very recent past,[18] and yet the "improvement" efforts continue.
*1041 Turning to the back end of the process, SunFrog allowed obviously infringing goods to come off its own production lines, to be packed and shipped by its employees, and then pocketed most of the profits, all without investigating the possibility of infringement or the identities of those who designed infringing goods. SunFrog knew it did not have a license to use the H-D Marks, and only willful blindness could keep it from realizing that it was nevertheless selling goods bearing those marks. In Hard Rock Café , 955 F.2d at 1148-49, the Seventh Circuit opined that a flea market owner could potentially be contributorily liable for infringing sales made by vendors because he failed to investigate the vendors' suspicious goods. If that is true, then it is hard to believe that SunFrog, whose business involves both hosting vendors and manufacturing goods on their behalf, could avoid contributory liability.
And on this point, it is simply ludicrous for SunFrog to put conceptual space between itself and its employees. SunFrog complains that it "holds licenses for several properties, ranging from college sports to film properties, and individual SunFrog employees who package items as they flow out of the printers could not discern between shirt designs that are licensed and those that are not." (Docket # 50 at 31). SunFrog is a corporate body that has no existence outside its officers and employees. That it does not train its workers to spot infringing designs is not a reason to protect it from liability. See Chanel, Inc. v. Italian Activewear of Fla., Inc. , 931 F.2d 1472, 1477-78 (11th Cir. 1991) ("Because of its very nature a corporation can act only through individuals. 'Obviously...if there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done.' ") (quoting Mead Johnson & Co. v. Baby's Formula Serv., Inc. , 402 F.2d 19, 23 (5th Cir. 1968) ); Meyer v. Holley , 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment."). Perhaps this excuse more than any other epitomizes SunFrog's ostrich-like conception of its duties.
All this dissembling begins to make sense when one appreciates that SunFrog's business model has been hugely successful. It has grown from making a million dollars in its first year to making over $150 million in 2017. It has become the largest maker of printed t-shirts in the country and one of the most popular websites in the world. It may cut deeply into SunFrog's bottom line to employ comprehensive, thorough anti-infringement policies and procedures. But what matters is that SunFrog pleads ignorance while sitting atop a mountain of resources that could be deployed to develop effective technology, review procedures, or training that would help combat infringement. Instead, it chooses to rest upon incongruous legal defenses.
In short, SunFrog cannot build a business around promoting and manufacturing infringing designs and then be freed from liability merely because it offers a notice-and-takedown procedure. At best, that theory only works when one has no hand in the infringing conduct. Summary judgment as to liability is, therefore, appropriate in Harley-Davidson's favor on its claims of federal and state trademark infringement, counterfeiting, and false designation of origin-Counts One, Two, Three, Six, and Seven of the complaint. See (Docket # 1); (Docket # 44 at 4 n.1).
3.2.2 Dilution
Harley-Davidson's remaining trademark claim, Count Four of the complaint, *1042 is for dilution, which is similar to the other claims but rests upon the additional finding that the marks in question are famous. Of the H-D Marks, the marks claimed to be famous are HARLEYDAVIDSON, HARLEY, H-D, HD, and the Bar & Shield logo (referred to collectively as the "Famous Marks"). To succeed on its dilution claim, Harley-Davidson must show that: (1) these marks are distinctive and famous; (2) SunFrog's promotion and sale of infringing products began after the Famous Marks became famous; and (3) the infringing products are likely to dilute the distinctiveness of the Famous Marks and their ability to identify and distinguish Harley-Davidson's goods and services. 15 U.S.C. § 1125(c)(1) ; H-D USA LLC v. Mayo , No. 14-CV-654-JPS, 2016 WL 7839144, at *2 (E.D. Wis. June 10, 2016). The purpose of a dilution claim, in contrast to a standard infringement claim, is to protect owners of famous marks from the erosion of the prestige and distinctiveness of their brand. Eli Lilly , 233 F.3d at 466.
3.2.2.1 The Marks Are Distinctive and Famous
To be famous, a mark must be "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Courts may consider all relevant factors in determining fame, including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods and services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered. Id. Importantly, fame for purposes of dilution is considered in relation to the American general public, not a potential niche market for a product. Top Tobacco, L.P. v. N. Atl. Operating Co., Inc. , 509 F.3d 380, 384 (7th Cir. 2007). The mark must be so well-known as to be a "household name" which is "immediately familiar to very nearly everyone, everywhere in the nation." 4 McCarthy § 24:104.
Applying these principles to the Famous Marks, it is beyond question that they are famous. First, they have been continuously and widely used throughout the United States for decades, and some for over 100 years. Second, Harley-Davidson and its licensees have sold many billions of dollars of products and services under these marks, and spent many millions of dollars extensively promoting them. Third, the Famous Marks have attracted wide and unsolicited media attention. Fourth, Harley-Davidson owns numerous federal registrations for the Famous Marks covering a variety of products and services. Most of these registrations, including those covering apparel, are incontestable, and thus constitute conclusive evidence of their validity and Harley-Davidson's ownership of those marks. 15 U.S.C. § 1115(b). In fact, several courts and the Trademark Trial and Appeal Board have previously observed that two of the marks at issue, HARLEY-DAVIDSON and the Bar & Shield logo, are famous, though not in the strict sense contemplated in Section 1125(c)(2)(A). See, e.g. , Packaging Supplies, Inc. v. Harley-Davidson, Inc. , No. 08-cv-400, 2011 WL 1811446, at *7 (N.D. Ill. May 12, 2011) ; H-D Mich. LLC v. Bryan C. Broehm , Application No. 78896325, 2009 WL 1227921, at *5 (T.T.A.B. Apr. 28, 2009). Accordingly, the Famous Marks are distinctive and famous such that they can form a basis for a dilution claim.
SunFrog contests this conclusion, arguing that material questions of fact exist as to the fame of the Famous Marks, particularly as to HD and H-D. The Court is not persuaded, however, as much of the argument *1043 rests on SunFrog's speculation about potential holes in the evidence, born of its failure to take discovery in order to mount an evidence-based challenge. SunFrog claims that
[i]t is doubtful...that two-letter marks such as H-D and HD could obtain the household recognition needed to be considered famous for the purposes of a dilution analysis. Plaintiffs must provide more than their affidavits to support a finding that H-D's Famous Marks, as defined in Plaintiffs' brief, are famous in the dilution context. And SunFrog should be able to test that evidence through discovery and the adverse [sic] process of the American judicial system.
(Docket # 50 at 35). SunFrog cites no evidence casting the doubt on which it relies, and so it is SunFrog's opposition, and not Harley-Davidson's evidence, which is impermissibly conclusory. Amadio , 238 F.3d at 927.
Moreover, SunFrog's reliance on Miramar Brands Group, Inc. v. Fonoimoana , Case No. CV 16-4224 PSG (RAOx), 2017 WL 2903256 (C.D. Cal. June 13, 2017), is misplaced. There, the district court stressed that "fame" is a demanding standard. Id. at *10 ; 4 McCarthy § 24:104 ("All 'trademarks' are 'distinctive'-very few are 'famous'."). In the case before it, the court concluded that the plaintiff had not come forward with sufficient evidence to prove that its marks, which related to volleyball products and apparel, were famous. Miramar , 2017 WL 2903256, at *10.
To meet its burden, the plaintiff relied upon the fact that its marks had been registered for more than thirty years and that its brands had earned millions of dollars in licensing revenues and royalties. Id. The court reasoned that the mere existence of a registration is not strong evidence of fame. Id. Moreover, evidence of large sales revenues is not enough to prove that the marks are indeed household names. Id. In other words, bandying around high dollar amounts cannot equate to a showing that the marks are well-recognized among the general public. Id. ; Nissan Motor Co. v. Nissan Computer Corp. , 378 F.3d 1002, 1012 (9th Cir. 2004).
SunFrog is correct that, like the plaintiff in Miramar , Harley-Davidson has no consumer surveys demonstrating its recognition among the purchasing public. But the evidence Harley-Davidson has marshalled is overwhelming in comparison to the generalizations offered in that case. If the relevant inquiry is ultimately whether the marks in question are household names, there can be no comparison between the Miramar marks-"King of the Beach" and "Queen of the Beach" for volleyball-related goods-and Harley-Davidson's world-renowned marks. Although the plaintiff in Miramar could only show that it was famous among the volleyball-enthusiast set, no member of the American public could encounter HARLEYDAVIDSON, HARLEY, H-D, HD, and the Bar & Shield logo without first thinking of the iconic motorcycle company. Coach Servs., Inc. v. Triumph Learning LLC , 668 F.3d 1356, 1373 (Fed. Cir. 2012). And even if this conclusion might be less sure with respect to H-D and HD, SunFrog has offered nothing more than supposition to contest it.
Moreover, where the Miramar plaintiff owned its marks for decades and spent several million dollars in promoting them, Harley-Davidson has owned some of the Famous Marks for over 100 years and has earned billions in sales after spending millions in promotional efforts. In short, the two cases are not in the same league. Instead, this case is far closer to Visa Int'l Serv. Ass'n v. JSL Corp. , 590 F.Supp.2d 1306, 1315 (D. Nev. 2008), where the court found that decades of worldwide promotion and over a trillion dollars in sales volume rendered the VISA mark famous. Thus, *1044 the Court finds that the Famous Marks are famous as a matter of law.
3.2.2.2 Remaining Elements of Dilution Claim
SunFrog does not contest any element of Harley-Davidson's dilution claim except the fame of the marks. (Docket # 50 at 34-35). The Court will recount the evidence on the remaining elements for the sake of completeness, but because SunFrog has conceded them, it does so only briefly. See Wojtas v. Capital Guardian Trust Co. , 477 F.3d 924, 926 (7th Cir. 2007) (plaintiff waived right to challenge statute of limitations defense by failing to oppose that argument in response to motion to dismiss); Cincinnati Ins. Co. v. E. Atl. Ins. Co. , 260 F.3d 742, 747 (7th Cir. 2001) (plaintiff's failure to mention defendant's argument regarding scope of insurance policy exclusion treated as "acquiescence" to defendant's interpretation, rendering unnecessary any substantive determination by the court). First, it is undisputed that SunFrog began promoting, advertising, offering for sale, and selling its infringing products in October 2016, long after the Famous Marks became famous. 15 U.S.C. § 1125(c)(1).
Second, Harley-Davidson has established both recognized types of dilution-"dilution by blurring" and "dilution by tarnishment." Mayo , 2016 WL 7839144, at *2. "Dilution by blurring" is the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). It occurs when consumers "see the plaintiff's mark used on a plethora of different goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Eli Lilly , 233 F.3d at 466. The Lanham Act sets out a non-exclusive list of factors for courts to consider to determine whether dilution by blurring is likely to occur: (1) the similarities between the marks; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the plaintiff is engaging in substantially exclusive use of the famous mark; (4) the degree of recognition of the famous mark; (5) the defendant's intent to create association with the famous mark; and (6) any actual association between the marks. 15 U.S.C. § 1125(c)(2)(B). Here, SunFrog used identical or materially indistinguishable variations of the Famous Marks, those marks are distinctiveness and famous, and SunFrog intended to create an association with the Famous Marks to trade on Harley-Davidson's fame and goodwill. See Mayo , 2016 WL 7839144, at *2 (noting that "[defendant's] sale of counterfeit products bearing HD's marks clearly intends to use that long-developed goodwill for its own profit" and constituted dilution by blurring).
The other type of dilution, dilution by tarnishment, "is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Here, tarnishment has occurred in several ways. First, SunFrog's cheaply made, knockoff products fall well below the quality standards that Harley-Davidson has long set for its licensees, harming its reputation with the purchasing public. See Rolex Watch U.S.A. , 645 F.Supp. at 494-95. As the Seventh Circuit has explained, "[i]f [a] seller provides an inconsistent level of quality, or reduces quality below what consumers expect from earlier experience, that reduces the value of the trademark." Scandia Down Corp. v. Euroquilt, Inc. , 772 F.2d 1423, 1430 (7th Cir. 1985).
Second, even if SunFrog's products met Harley-Davidson's quality control standards, many of them would not meet its content criteria. Many of the offending *1045 products include vulgar, political, or religious content that Harley-Davidson would not have approved to appear on licensed products. Others modify or mutilate the H-D Marks, or display marks that Harley-Davidson does not license, which again Harley-Davidson would not have approved of. There is perhaps no greater tarnishment of a famous brand than using it in an unauthorized way that likely will offend potential purchasers of genuine goods. Deere & Co. v. MTD Prods., Inc. , 41 F.3d 39, 43 (2d Cir. 1994) (tarnishment occurs "when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product"). Thus, the Court finds that summary judgment is appropriate on Harley-Davidson's dilution claim.
3.3 Remedy
3.3.1 Statutory Damages on the Counterfeiting Claim
When a plaintiff succeeds in proving counterfeiting, as opposed to mere infringement, of his trademarks, he may elect to receive an award of statutory damages in lieu of actual damages. 15 U.S.C. § 1117(c). The Lanham Act provides the following outer boundaries for statutory damages awards:
(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.
Id. The statute's reference to "type of goods" means just that-the statutory damages award must be made per type of infringing good, "not per individual item bearing the counterfeit mark." Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli , 575 F.3d 693, 698 (7th Cir. 2009).
To receive statutory damages, the plaintiff must establish not only counterfeiting but also that the marks in question are registered for use on the same goods or services for which the defendant used the marks. 15 U.S.C. § 1116(d)(1)(B) ; Coach , 2013 WL 2402922, at *9. Harley-Davidson acknowledges that a few of its federal registrations do not cover all of the types of counterfeit goods sold by SunFrog. (Docket # 44 at 23). Thus, the Court will not consider those goods in reaching a statutory damages award. As to those for which there is a registration, the counterfeiting liability established above paves the way for a statutory damages award. But before determining the appropriate quantum of damages, the Court must decide the permissible range for the award-i.e. , whether the infringement here is willful.
3.3.1.1 Willfulness
The Court earlier explained that infringement is willful when the infringer knows that it is infringing or acts "in reckless disregard" of that possibility. Wildlife Exp. Corp. , 18 F.3d at 511. To find knowing infringement, "willful blindness is knowledge enough." Lee , 875 F.2d at 590 ; Hard Rock Cafe , 955 F.2d at 1149. A defendant's conduct can support an inference of knowledge, including when the "defendant ignored the plaintiff's notices[,] did not seek advice of an attorney, and passed the matter off as a nuisance." Lorillard , 2004 WL 2534378, at *4.
In rejecting the Tiffany defense, the Court discussed at length why SunFrog's pre-suit conduct epitomized a head-in-the-sand approach to infringement. See supra Part 3.2.1.4; Rechanik , 249 Fed.Appx. at 479. The Court will not retread that ground. However, a few observations *1046 about SunFrog's post-suit conduct are in order, as they bolster the contention that "willful" is the only appropriate way to describe SunFrog's conduct.
First, SunFrog lied in opposition to Harley-Davidson's motion for preliminary injunction. It said it had implemented procedures to stop infringement from occurring, but Harley-Davidson showed that this was untrue. Second, SunFrog violated the Court's preliminary injunction several times, despite numerous letters from counsel for Harley-Davidson regarding continued offerings of infringing goods. SunFrog makes much of Harley-Davidson's failure to send a pre-suit demand letter, claiming this could all have been worked out amicably. But if SunFrog will not comply with this Court's injunction, what good would a letter have done? See Sara Lee Corp. v. Bags of N.Y., Inc. , 36 F.Supp.2d 161, 169 (S.D.N.Y. 1999) (finding that the defendants' persistence in infringing despite court orders meant they were "difficult to deter").
As it tacitly concedes that infringement has continued even after a lawsuit and an injunction, SunFrog claims it is trying its best to develop a more robust anti-infringement protocols. But SunFrog did not come to court on bended knee, like eBay did in Tiffany , hoping to join in the effort to curb trademark infringement. See Tiffany , 600 F.3d at 98. SunFrog came in fighting, apparently hoping to defend its business model on legal theories of dubious value. In other words, although eBay sought to defend its reputation as a safe place to do business, id. , SunFrog battled for its right to exploit infringement for profit. Moreover, even when it does try to show off its burgeoning capability to detect and deter infringement, SunFrog maintains that the process has been more expensive and cumbersome than it likes.
One need only consider SunFrog's lackluster defense at summary judgment to know that it had little chance of succeeding in this lawsuit. The Court cataloged SunFrog's failure to raise more than a handful of factual disputes, and none concerning material facts. It also thoroughly explained why SunFrog's legal theories do not hold water. Rather than roll up its sleeves from the start to develop and implement anti-infringement practices that actually worked, SunFrog tried to avoid liability entirely by pointing the finger at everyone else involved. But trademark law is practical, and its doctrines fit the realities of the marketplace. In law, as in business, cleverness and technicality are poor substitutes for hard work and honesty. SunFrog willfully counterfeited Harley-Davidson's marks.
3.3.1.2 The Appropriate Damages Award
The Court next considers what amount of statutory damages is appropriate. There is no rigid formula for calculating statutory damages; instead, courts enjoy broad discretion in selecting an appropriate figure. See Chi-Boy Music v. Charlie Club, Inc. , 930 F.2d 1224, 1229 (7th Cir. 1991) ; Lorillard , 2004 WL 2534378, at *4. Courts consult various factors in this endeavor, such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent." Chi-Boy , 930 F.2d at 1229. Statutory damages can fill an important role when compensatory damages would be "too slight to warrant the expense of determining but deterrence would be served by a money judgment." Gabbanelli , 575 F.3d at 698. Thus, "an award of statutory damages serves dual interests in that it is remedial in nature but also intended to protect an important public interest" in deterring counterfeiting.
*1047 Deckers Outdoor Corp. v. Does 1-55 , No. 11 C 10, 2011 WL 4929036, at *5 (N.D. Ill. Oct. 14, 2011) (citing Sands, Taylor & Wood v. Quaker Oats Co. , 34 F.3d 1340, 1348 (7th Cir. 1994) ); Rolls-Royce PLC v. Rolls-Royce USA, Inc. , 688 F.Supp.2d 150, 157 (E.D.N.Y. 2010) ; Coach, Inc. v. Zhen Zhen Weng , No. 13 CIV 445, 2014 WL 2604032, at *18 (S.D.N.Y. June 9, 2014). Courts calculating statutory damages also consider the value of the plaintiff's brand and its efforts to protect the brand. Lorillard , 2004 WL 2534378, at *6.
To reach the appropriate quantum of damages in this case, the Court must first address SunFrog's threshold suggestion that statutory damages are entirely unwarranted. SunFrog complains that Harley-Davidson failed to tailor its request for statutory damages to its actual loss or SunFrog's actual profits, based on sales data and financial information SunFrog has produced in discovery. (Docket # 50 at 10, 14).
This argument goes too far. Actual profits or losses can be relevant in the wide-ranging search for a just damages award, but it must be remembered that the Lanham Act gives plaintiffs in counterfeiting cases the option to seek statutory damages instead of actual damages. Rolls-Royce , 688 F.Supp.2d at 158 ; Versace v. Awada , No. CV033254, 2010 WL 11515467, at *4 (C.D. Cal. Aug. 2, 2010). Many courts have rejected the plea that the infringer's actual profits were fairly low. See, e.g., Diane Von Furstenberg Studio v. Snyder , No. 1:06CV1356, 2007 WL 3143690, at *5 (E.D. Va. Oct. 23, 2007), aff'd , 294 Fed.Appx. 10 (4th Cir. 2008). This is particularly true for cases like this one, where rampant infringement with low-quality counterfeits did not simply deprive Harley-Davidson of profit but also damaged its brand and reputation. See id. ; H-D U.S.A., LLC v. Guangzhou Tomas Crafts Co., Ltd. , Case No. 16-cv-10096, 2017 WL 6733685, at *5 (N.D. Ill. Dec. 18, 2017). SunFrog's argument is unavailing.[19]
The Court can now turn to the factors that inform its damages determination. Notably, while SunFrog argues that statutory damages are not appropriate, and that the damages requested are too high, it has not challenged in any way Harley-Davidson's demonstration that there are sixty-four different types of goods bearing different H-D Marks. See (Docket # 44 at 22-26). Thus, the Court accepts Harley-Davidson's accounting on that score as unopposed, noting parenthetically that it is also consistent with the decisions of numerous district courts in similar cases. See, e.g., Rolls-Royce , 688 F.Supp.2d at 159.
Statutory damages awards in district courts across the country vary widely. For instance, the court in Nike, Inc. v. Top Brand Co. , No. 00 Civ. 8179(KMW)(RLE), 2006 WL 2946472, at *3 (S.D.N.Y. Feb. 27, 2006), awarded the then-maximum of $1 million per mark, per type of infringing good, for a total award of $17 million, in a case against a large-scale infringer that produced millions of infringing goods and committed numerous abuses of the litigation process. In Sara Lee , the award was $750,000 per mark per type of good where the infringing operation was a sizable handbag shop and showroom in New York City and the defendant-owner continued counterfeiting even after litigation began. Sara Lee , 36 F.Supp.2d at 169. In Coach , *1048 the total award for twenty-four types of goods sold by a small New York gift shop was $500,000, in view of the small size of the operation as against the fact that the defendants continued to sell counterfeits despite numerous arrests for the same and attempted to conceal their operations. Coach , 2014 WL 2604032, at *19. As one can see, the awards are all over the map, and perhaps rightly so, since the award is meant to be tailored to the facts of the case at hand.[20]
Without much consistency in the decisions of sister courts, this Court rests primarily on its own exercise of discretion in light of the relevant analytical factors. First, actual damages are likely hard to prove in this case. Chi-Boy , 930 F.2d at 1229. SunFrog suggests-without citation to evidence-that the total sales for infringing goods is less than $250,000, (Docket # 50 at 14), but this does not account for the significant potential for damage to Harley-Davidson's goodwill and reputation through the dissemination of cheaply made, knockoff goods bearing offensive or mutilated settings of its trademarks-marks that it has developed and strengthened over decades of exposure and expenditure. Lorillard , 2004 WL 2534378, at *6. Moreover, the Lanham Act allows statutory damages to be large even when actual damages are small, for the very reason that deterring counterfeiting is important. Gabbanelli , 575 F.3d at 698. This is especially critical when the infringer utilizes the capacity of the internet to effect enormous, rapid distribution of counterfeit goods. See Burberry LTD. & Burberry USA v. Designers Imports, Inc. , No. 07 Civ. 3997(PAC), 2010 WL 199906, at *10-11 (S.D.N.Y. Jan. 19, 2010). That said, though SunFrog has become a massive company, drawing revenues in the hundreds of millions of dollars, the actual profit from these specific goods appears to be low. Nike , 2006 WL 2946472, at *2 (noting that maximum statutory damages award was appropriate where infringer had a large operation and millions of infringing goods were produced).
Second, as examined in detail throughout this opinion, the circumstances of SunFrog's infringement are deeply troubling. Chi-Boy , 930 F.2d at 1229. SunFrog seems to have developed a business that facilitated blatant infringement of others' intellectual property rights on the misguided notion that it was immune to liability as a "service provider" that offered a notice-and-takedown procedure. See (Docket # 50 at 12) (contending that damages are unwarranted because SunFrog is "utiliz[ing] cutting edge technology to provide consumers with opportunities that could not have existed even a few years ago").
This is incorrect. Instead, the law as applied to SunFrog demonstrates that it endeavored to trade on Harley-Davidson's goodwill by selling knockoffs of its licensed apparel and other items. See Coach , 2014 WL 2604032, at *18 ; Microsoft Corp. v. CMOS Tech., Inc. , 872 F.Supp. 1329, 1335 (D.N.J. 1994) ("It would be difficult to imagine a clearer case of consumer confusion than the instant case in which the defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety."). As the Court earlier explained, simply applying SunFrog's own mark to the goods did not dispel that confusion but more likely only increased it.
Further, SunFrog repeatedly violated Harley-Davidson's rights and orders of the Court. See Sara Lee , 36 F.Supp.2d at 168-69 (finding that infringer's repeated *1049 efforts to mislead the court about ceasing infringement supported a high damages award); Coach , 2014 WL 2604032, at *3. It has not been sanctioned for its litigation conduct, as in Sara Lee , nor is there evidence that it has tried to cover up its operations, as in Coach , but the fact remains that SunFrog only begrudgingly dragged its feet down the path to compliance. It is therefore deserving of a sanction to deter it from continuing its business model and to discourage others from making similarly underprepared ventures. See Rolls-Royce , 688 F.Supp.2d at 157. The public, too, would be served by a weighty damages award, to serve as a warning to those who operate businesses over the internet that with the hope of skyrocketing success should come the awareness that rights holders need not await the end of corporate growing pains. Deckers , 2011 WL 4929036, at *5.
All that said, the Court finds that this is not a case for an award anywhere near the statutory maximum. By volume, this case implicates more types of infringing goods than nearly any other case the Court could locate. Given the need to multiply any damages figure by sixty-four in order to arrive at a final award, the Court is mindful that deterrence, compensation, and the public interest do not require an award that would instantaneously shutter SunFrog's operations, as an award of $128 million likely would.
Additionally, though SunFrog is undoubtedly a counterfeiter, it did not try to pass off its entire business as a fraud, such as occurred in Rolls-Royce , 688 F.Supp.2d at 157. The Court agrees with SunFrog that most cases involving a maximum award of statutory damages involve "actual counterfeiters who manufactured expensive counterfeit luxury goods and then sold through illicit channels." Coach , 2014 WL 2604032, at *18-19. SunFrog certainly is not a company comprised of career criminals.
Finally, while the evolution of SunFrog's anti-infringement procedures and technology is not relevant to the underlying question of infringement, it does persuade the Court that SunFrog has made slow but significant progress in conforming its conduct to the requirements of the law. This removes it still further from the rampant, continuing infringement at issue in many of the cases Harley-Davidson cites. Indeed, the infringement at issue in this case appears to have lasted only a few years or less. And the task before SunFrog has not been easy, as the explosive growth of its business has meant a daily downpour of design submissions and infringement perpetrated by computer programs rather than individuals. (Docket # 50 at 12-13).
For these reasons, the Court, having considered the entire factual record in this case, along with the pertinent legal authorities, finds that a just award of statutory damages in this case is $300,000 per mark per type of counterfeit good, for a total statutory damages award of $19,200,000.
3.3.2 Permanent Injunction
In addition to statutory damages, Harley-Davidson requests that the Court convert its preliminary injunction into a permanent one. (Docket # 44 at 28). To obtain a permanent injunction, the plaintiff must demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, an injunctive remedy is warranted; and (4) the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C. , 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) ; Mayo , 2016 WL 7839144, at *2.
*1050 Harley-Davidson has made a prima facie showing as to each of these elements. (Docket # 44 at 28-30). As the Court has previously noted, because of the difficulty in quantifying damage to the reputation or goodwill of a mark holder, courts presume irreparable harm and the inadequacy of legal remedies in Lanham Act cases. (Docket # 33 at 3); Promatek Indus., Ltd. v. Equitrac Corp. , 300 F.3d 808, 813 (7th Cir. 2002) ; Meridian Mut. Ins. Co. , 128 F.3d at 1120. Further, Harley-Davidson contends that because of the obviousness of SunFrog's counterfeiting operation, the ongoing harm to Harley-Davidson's brand, and SunFrog's ability to continue its business selling non-infringing goods, the balance of harms favors it here. (Docket # 44 at 29-30). Finally, Harley-Davidson points out that injunctions in trademark cases are generally found to serve the public interest because they protect the public from confusion about the products they purchase. Int'lKennel Club , 846 F.2d at 1092 n.8 ; Promatek Indus. , 300 F.3d at 813-14.
SunFrog did not respond to any of these arguments. Indeed, it mentions the word "injunction" nowhere in its brief. Consequently, even if SunFrog could mount an effective defense to the need for an injunction-which is quite unlikely-it has conceded the issue. Wojtas , 477 F.3d at 926 ; Cincinnati Ins. Co. , 260 F.3d at 747. The Court will grant a permanent injunction along with its damages award. That permanent injunction will be issued as a separate order entered contemporaneously with this Order.
4. CONCLUSION
For the reasons stated above, the Court finds that it must largely grant Harley-Davidson's motion for partial summary judgment. It finds in Harley-Davidson's favor as to SunFrog's liability on Counts One, Two, Three, Four, Six, and Seven of the complaint. As to Count One, the counterfeiting claim, the Court further awards statutory damages in the amount of $19,200,000. Finally, as to all of the trademark and unfair competition claims, including the counterfeiting claim, the Court further finds it appropriate to enter a permanent injunction against SunFrog's continued infringement.
The Court's disposition of the issues leaves only two matters for trial: (1) the amount of compensatory damages, if any, to award for any non-counterfeiting acts of infringement covered by Counts Two, Three, Four, Six, and Seven; and (2) liability and damages on Harley-Davidson's claim of copyright infringement, which is Count Five of the complaint.
Accordingly,
IT IS ORDERED that Plaintiffs' motion for summary judgment (Docket # 43) be and the same is hereby GRANTED in part as stated herein;
IT IS FURTHER ORDERED that Plaintiffs' motion to file under seal certain exhibits submitted in connection with their motion (Docket # 42) be and the same is hereby GRANTED ; and
IT IS FURTHER ORDERED that Plaintiffs be and the same are hereby AWARDED statutory damages in the amount of $19,200,000 as to Count One of their Complaint, counterfeiting under the Lanham Act. Entry of judgment on that count will await complete disposition of all of the claims in this action.

At the outset, it is worth noting that the Court set aside virtually all of SunFrog's purported disputes as to the material facts. In many instances, SunFrog was simply mistaken when it said that the cited evidence did not support the assertion in question. For example, contrary to SunFrog's view, the declaration of Harley-Davidson's vice president for communications, Joanne Bischmann ("Bischmann"), contains an averment that Harley-Davidson has continuously manufactured, promoted, and sold motorcycles and related products for over 110 years. (Docket # 51 ¶ 8); (Docket # 8 ¶ 10). This sort of error pervades SunFrog's fact briefing. SunFrog's failure to read the cited material carefully led to many imprudent disputes.
Similarly, SunFrog challenged a number of assertions as "a statement of opinion" that apparently should have no evidentiary weight on its own. (Docket # 51 ¶ 8). This too is incorrect. Bischmann's claim that Harley-Davidson is a world-famous motorcycle manufacturer is sworn testimony that appears to be based on her personal knowledge; it is therefore admissible. Fed. R. Evid. 701. That it is an opinion is of no moment. See Von der Ruhr v. Immtech Int'l, Inc. , 570 F.3d 858, 862 (7th Cir. 2009) ; Fed. R. Evid. 701 advisory committee's note (lay opinions by officers of a business are admissible "not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business"). If SunFrog thought her opinion was wrong or biased, it could have produced evidence challenging it. And if there was some other ground on which the testimony might be inadmissible, like hearsay or lack of personal knowledge, SunFrog did not raise it.

Bischmann avers that Harley-Davidson has registered these marks in the federal and Wisconsin registers, as well as many variants thereof. (Docket # 8 ¶¶ 35-43). SunFrog tries to dispute this claim, noting that Bischmann does not use the words "Principal Register" (the name for the federal trademark register) in her declaration, nor does she opine on the current status of the registrations. (Docket # 51 ¶¶ 20-21). SunFrog's first dispute is only about wording and does not raise a real challenge to the registration of the marks. Its second dispute also falls short; Bischmann says that the company "owns" registrations for the marks in question, and her use of the present tense satisfies the Court, in the absence of evidence to the contrary, that the registrations have been kept current.

Here is found another of SunFrog's puzzling attempts at disputing the facts. First, it says that these assertions are not supported by the record, (Docket # 51 ¶ 14), but these exact words, or ones very much like them, are found right in the text of Bischmann's affidavit, (Docket # 8 ¶ 28). SunFrog further asserts that these assertions should be disregarded because "SunFrog has not been able to conduct discovery to verify the veracity of Plaintiffs' statement." (Docket # 51 ¶ 14). But why not? Discovery in this case has been open since at least July 2017. See (Docket # 23). This latter contention popped up again and again in SunFrog's fact briefing and its legal brief, so the Court will address it separately below. See infra Part 3.1.

SunFrog here counters that it is "merely a transaction service provider to third parties." (Docket # 51 ¶ 27). Not only is this statement not responsive to the facts in this paragraph, SunFrog's evidence is its reply brief in support of its motion to dismiss. Arguments in a legal brief are not evidence of anything, at least nothing bearing on Harley-Davidson's proposed facts. Fed. R. Civ. P. 56(c) ; Gross v. Knight , 560 F.3d 668, 672 (7th Cir. 2009) ; In re eBay, Inc. Deriv. Litig. , Civ. No. 10-470-LPS, 2011 WL 3880924, at *5 n.8 (D. Del. Sept. 2, 2011) ("Arguments made in a brief are not evidence."). It is not without irony, then, that SunFrog chides Harley-Davidson for relying on one of its briefs for one of its factual propositions. (Docket # 51 ¶ 116). And, admissibility aside, SunFrog's cited briefs themselves have no affidavits or other evidence attached to them. See (Docket # 28, # 37). Whatever facts are stated therein rest solely on the unsworn representations of counsel. This is yet another regrettable error that pervaded SunFrog's submissions. The Court will not catalog each instance; it has simply ignored citations to legal briefs unless otherwise noted.
Also present in this portion of the fact briefing are SunFrog's many irrelevant asides and additional assertions of fact, unsupported by admissible evidence. See, e.g. , (Docket # 51 ¶ 31). This lamentable practice wasted the Court's time while adding nothing to its consideration of the issues.

SunFrog's response is that its printers are fully automated and operate at the direction of SunFrog's users, making it merely an on-demand printing service for user-created art. See (Docket # 51 ¶¶ 28-29, 37-41). This position suffers from a number of problems. First, it is SunFrog's gloss on the nature of its business operations and is largely non-responsive to Harley-Davidson's factual claims. Second, its rests solely on SunFrog's lawyers' statements in prior legal briefs. See id. ; seesupra note 4. Perhaps SunFrog could have cited the affidavit of its corporate counsel on these matters, see (Docket # 52), but it did not do so.

SunFrog asserts that it does not "take title" to the goods it creates, (Docket # 57 ¶ 12), but it does not explain what it means. Not only is this a legal conclusion, inappropriate for a statement of facts, it is also ludicrous-SunFrog owns the raw material and the printers and takes the majority of the revenue from product sales. It is, therefore, not analogous to a mere broker, rather than a direct seller, as will be explained further below. See infra Part 3.2.1.2; GMA Accessories, Inc. v. BOP, LLC , 765 F.Supp.2d 457, 464 (S.D.N.Y. 2011).

Not to belabor SunFrog's half-hearted attempts at disputing the facts, but SunFrog's entire response to this paragraph of information is the sentence, "SunFrog is not a t-shirt maker, it is a service provider," (Docket # 51 ¶ 51), bereft of citation to any evidence at all. The same goes for the next paragraph. Id. ¶ 52.

At many points, SunFrog disputes the notion that it is a purveyor of counterfeit goods. See (Docket # 55 ¶ 56). But in only one instance does SunFrog explain that its "user-generated designs [ ] differ too greatly from Plaintiffs' licensed apparel to be counterfeits." Id. SunFrog cites no evidence for this proposition. In any event, it is more properly a legal argument than a factual one, and it is addressed below. See infra Part 3.2.1.1.

SunFrog wants to strike Harley-Davidson's infringement analyses for the reason that they are based on "nothing but their own self serving, conclusory declarations." (Docket # 51 ¶¶ 58-68). As with most of SunFrog's factual disputes, this one is entirely without merit. Courts do not dispense with sworn statements on summary judgment merely because they are self-serving or conclusory; those are matters for the trier of fact to consider when evaluating the credibility of the statements. The Seventh Circuit has emphasized this point for over a decade. Hill v. Tangherlini , 724 F.3d 965, 967 (7th Cir. 2013) ; McKinney v. Office of Sheriff of Whitley Cnty. , 866 F.3d 803, 814 (7th Cir. 2017). Provided that the statements meet the other requirements of admissibility, such as personal knowledge, they can be considered. Payne v. Pauley , 337 F.3d 767, 773 (7th Cir. 2003).

Harley-Davidson views the takedowns as SunFrog's concession that infringement was occurring, but SunFrog says that it acquiesced in takedown requests without determining whether the challenged designs were in fact infringing.

During the pendency of the motion for preliminary injunction, SunFrog filed a motion to dismiss the complaint for failure to state a claim. (Docket # 27). That motion was denied in an order dated October 4, 2017. (Docket # 40).

Harley-Davidson was not immune to the perils of inapposite challenges to factual statements. It claims that many of Carol's sworn statements are not statements of fact but are instead "allegation[s] that [are] vague and ambiguous." See, e.g. , (Docket # 57 ¶¶ 19-22). True, his testimony may not be persuasive to a jury because it is vague or hard to corroborate, but at summary judgment Carol's sworn testimony cannot be disregarded for those reasons. However, the Court observes that Carol opines on a wide range of topics touching upon marketing, law, and computer science. This perhaps stretches the limit of the topics upon which corporate counsel can testify, Von der Ruhr , 570 F.3d at 862 (a corporate representative may only testify about those matters on which he possesses personal knowledge by virtue of his position in the company), but Harley-Davidson did not make that argument.

For this reason, SunFrog's separate defense to the false designation of origin claim-that it does not "affix, apply, or annex any false designations of origin" onto the goods in question-is without merit. (Docket # 50 at 33); 15 U.S.C. § 1125(a). The false designation of origin claim will not be discussed further herein, as the parties seem to agree that the relevant inquiry is largely identical to the standard infringement analysis. See (Docket # 44 at 6-9); (Docket # 50 at 33). It will, therefore, be subsumed into the existing discussion.

The Court's earlier decision contained a clerical error, referring to the Tiffany at issue in the Second Circuit case as the lamp maker rather than the jewelry maker. Thus, the quotation has been slightly altered, but has no less force.

In its motion to dismiss, SunFrog placed great reliance on the "innocent infringer" defense to damages for trademark infringement, codified in Section 1114(2)(A), which provides that one who is engaged solely in the business of printing matter for others can only be subject to injunctive relief, not damages, if that matter contains protected marks. See (Docket # 40 at 6-9). This argument is similar to, but not coextensive with, the Tiffany defense. SunFrog chose not to assert the innocent infringer defense in opposition to Harley-Davidson's summary judgment motion, and so the Court considers it waived. See Anderson , 241 F.3d at 545-46. In any event, a printer cannot be innocent when he acts in reckless disregard of whether the matter he prints is infringing. See (Docket # 40 at 6-9); World Wrestling Fed'n, Inc. v. Posters, Inc. , No. 99 C 1806, 2000 WL 1409831, at *3 (N.D. Ill. Sept. 26, 2000). The undisputed facts in the record would belie any claim to this defense that might have been made.

The Court's conclusion is bolstered by the fact that SunFrog did not contest Harley-Davidson's infringement analysis submitted in connection with its request for statutory damages. See infra Part 3.3.1. There, Harley-Davidson supplied a chart that identified types of goods SunFrog offers for sale and indicated which H-D Marks had appeared on each type. See (Docket # 44 at 23). SunFrog had the opportunity to object to this analysis on the ground that some of the categories had never actually become a physical product. It did not. Indeed, beyond the generalization that many designs do not become manufactured goods, SunFrog did not point out a single instance in which this circumstance arose with respect to the H-D Marks.

SunFrog reports that it has not received any letters from opposing counsel since November 2017 notifying it of further instances of infringement. (Docket # 50 at 13). But even if SunFrog has been able to better forestall infringement quite recently, it makes no difference to its liability prior to that point.

The following lawsuits were filed against SunFrog between September 2016 and April 2017, alleging various claims of trademark and copyright infringement: (1) Methodist Le Bonheur Healthcare v. SunFrog LLC , No. 2:16-cv-02718 (W.D. Tenn. 2016); (2) Hamilton Uptown LLC v. SunFrog, LLC , No. 1:2016-cv-834 (S.D.N.Y. 2016); (3) Siemens Aktiengesellschaft v. SunFrog, LLC , No. 1:16-cv-08411 (S.D.N.Y. 2016); (4) Bravado Int'l Grp. Merchandising Servs. Inc. & Zion Rootswear, LLC v.Sunfrog, LLC , No. 2:16-cv-08657, 2017 WL 5592911 (C.D. Cal. 2016) ; (5) Merchdirect LLC v. Sunfrog LLC , No. 1:17-cv-00488 (S.D.N.Y. 2017); (6) The Ohio State University v. SunFrog, LLC , No. 2:17-cv-00229 (S.D. Ohio 2017); and (7) The Life is Good Company v. SunFrog LLC , No. 1:17-cv-10602 (D. Mass. 2017).

For these reasons, the Court finds less persuasive the suggestion filtering through some district court opinions that "[s]tatutory damages should represent some approximation of actual damages and are not to represent a windfall to a prevailing plaintiff." Coach, Inc. v. Treasure Box, Inc. , No. 3:11CV468-PPS, 2014 WL 888902, at *4 (N.D. Ind. Mar. 6, 2014). No court seeks to give a party a windfall, but statutory damages simply do not serve the same functions as compensatory damages.

This Court entered an award of $2 million per mark per type of goods in Mayo , 2016 WL 7839144, at *2, but the Court does not find that decision persuasive in the present context because the request for that award was unopposed.